HUGH H. HAWKINS *v.* VERMONT HYDRO-ELECTRIC CORPORATION.

May Term, 1924.

Present:    WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed October 7, 1924.

*Electricity—Necessity of Applicant for Service Complying With Reasonable Conditions Precedent—Scope of G. L. 5066 Stated—Right of Public Service Corporation to Make Reasonable Regulations and Enforce Them—Rules Relating to Switch Box and Ground Wires Held Reasonable, and Service Properly Refused When Not Complied With—Rules of Installation as Condition Precedent to Service Not Discriminatory.*

1.  One desiring to compel a public service corporation, engaged in generating and distributing electric current, to supply him therewith, must put himself in a proper position to demand service, by complying with such reasonable conditions precedent to such service as the company may impose.

2.  G. L. 5066, as amended by No. 129, Acts of 1919, and by No. 92, Acts of 1923, has no relation to regulations affecting precedent conditions, a substantial compliance with which may be made essential to an applicant's right of service, but pertains solely to the subject-matter of rates.

3.  A public service corporation, engaged in generating and distributing electric current, has implied power to adopt reasonable and lawful regulations, without unjust discrimination, for the conduct of its business binding on its patrons and enforcible against them, even to the extent of refusing service to those who refuse to comply with them.

4.  Refusal of such a company to connect dwelling house with its distribution service and to furnish service as requested, until applicant for service had complied with its reasonable rules and installed the kind of entrance switch box, and provided the ground wires prescribed by its general service requirements, *held* proper.

5.  Rules prescribed by a public service corporation distributing electrical current as conditions precedent to furnishing service to an applicant therefor *held* not to be discriminatory.

APPEAL from the decision and order of the Public Service Commission, Bennington County, granting prayer of petitioner for service by a public service corporation engaged in the distribution and sale of electricity. The petitionee excepted and appealed. The opinion states the case. *Exceptions sustained, order vacated, and petition dismissed.*

*Stickney, Sargent & Skeels* and *Frank K. Foster* for the petitionee.

A public service corporation has the right to properly provide against unnecessary danger to the public, whom it serves; to make reasonable rules and regulations governing service; and to refuse service when such rules and regulations are not complied with. *Tismer* v. *New York Edison Co.*, 170 App. Div. 647, 156 N. Y. S. 28, (on appeal) 228 N. Y. 156; *Abrams* v. *City of Seattle*, 60 Wash. 356, 140 A. S. R. 921.; 1 Elliott on Railroads, §§ 199, 200; *Pittsburgh, etc. Ry. Co.* v. *Lyon*, 123 Pa. St. 140, 10 A. L. R. 517; *Poole* v. *B. P. R. R. Co.*, 16 Or. 261, 8 A. L. R. 289; *N. & W. Ry. Co.* v. *Wyson*, 82 Va. 250; *St. Louis, etc. R. R. Co.* v. *Dyer*, 115 Ark. 262, 170 S. W. 1013; *Pearson* v. *Duane*, 4 Wall. 605; *Higgins* v. *Ft. Dodge, etc. R. R. Co.*, 150 Iowa, 313, 130 N. W. 148; *St. Louis, etc. Ry. Co.* v. *Blythe*, 94 Ark. 153, 136 S. W. 368, 29 L. R. A. (N. S.) 299; *Schmur* v. *Gaslight Co.*, 147 N. Y. 529, 536, 42 N. E. 202, 30 L. R. A. 653; *Stephen* v. *Smith*, 29 Vt. 160, 163.

The defendant electric company was justified in refusing to furnish current to apparatus which it knew was defective and dangerous. *Smith Admx.* v. *Middleboro et al.*, 164 Ky. 46, at p. 62; *Scott* v. *Rome Ry. & Light Co.*, 22 Ga..App. 474, at p. 476; Curtis Law of Electricity, § 417; *Benson* v. *American Illuminating Co.*, 102 N. Y. S. 206, at pp. 207, 208.

*Lawrence, Stafford & Bloomer* for the petitioner.

Statement by Chief Justice WATSON: This is a petition brought to, and the facts were found by, the Public Service Commission. The facts stated below and in the opinion are taken from those so found including exhibits made a part thereof. The petitioner is a resident of Manchester Depot, so-called, in the town of Manchester, this State, and owns and occupies with

his family, a house there situated.   The petitionee is a public service corporation organized under the general laws of the State, engaged under its expressly authorized power in the generation and distribution of electric current for light, heat, and power in Manchester and other localities in the State, and having a distribution system in Manchester Depot.

Early in the summer of 1923 the petitioner engaged one Marsden, a local electrical contractor, to wire his house and equip the same with facilities for electric lighting.   This work was undertaken and completed by Marsden.   On the completion of the wiring job, application was made to the petitionee by the petitioner to connect his house with the former's distribution lines so as to provide the latter with the necessary electrical current for lighting his premises, but the application was not in writing in compliance with rule (1) of the petitionee's "Rules and Regulations for Electric Light and Power."   This application was refused by the petitionee on the ground fully stated in the opinion.

It was claimed by the petitionee that the place of entrance into the petitioner's house as located by him, was inconvenient and expensive to the petitionee and made it necessary to place its connecting wires under the eaves of the house where damage was likely to result from ice and snow from the roof; but the petitioner offered to change the place of entrance as suggested by the petitionee and that issue was left to be agreed upon by the parties and so was not further considered.

The Public Service Commission ordered that when the place of entrance into petitioner's house is arranged as suggested by the petitionee, the latter shall make the necessary connections and furnish to the petitioner electric current to meet his requirements.

The petitionee excepted to the various holdings of the Commission mentioned in its exceptions, and appealed from the foregoing order and decree—thus passing the case to the Supreme Court.

WATSON, C. J.   The petitionee excepted to certain legal propositions stated by the Public Service Commission in the abstract and basing its conclusions thereon, but as our concern is limited to the requirements of the case in hand we state such propositions in their concrete form and treat them accordingly.

Exception was saved to each of the holdings by the Commission that under the Constitution of this State the petitioner could pipe his house for electric lights in any manner he chose; and that, standing on his constitutional rights, he could adopt any system of wiring whatsoever, unless some lawfully constituted authority had prescribed a different method.

[1] Considering the first question as applied to this case, the legal proposition is sound only when stated in connection with conditions precedent governing the petitioner's right to be served by the petitionee, a corporation engaged in the kind of public service sought by him; for ''those who wish service must always put themselves in a proper position to demand service; and until these conditions precedent are complied with, there is no present obligation to serve such persons.'' 1 Wyman, Pub. Serv. Corp., § 390; *Atlantic Terminal Co.* v. *American Baggage & Tr. Co.*, 125 Ga. 677, 54 S. E. 711; *Burrowes* v. *Chicago B. & Q. Ry. Co.*, 87 Neb. 142, 126 N. W. 1084, 34 L. R. A. (N. S.) 223. Mr. Wyman says (section 406): ''That the supplying companies are under a general obligation to supply all householders living within the district which the company has professed to serve is therefore plain. But there are conditions precedent to these services, also, which it will be reasonable for the company to impose, under the circumstances. The service of such householders is undertaken at the premises, and the applicant must be ready with his piping or his wiring, as the case may be, properly arranged to receive the supply at the outer wall. As has been seen, the supply companies undertake their service generally only to those applicants whose premises are properly equipped so as to receive the service in question.'' And the same author says (section 417): ''A service company may impose regulations upon the making of connections with its system.'' See *Public Service Corp.* v. *American Lighting Co.*, 67 N. J. Eq. 122, 57 Atl. 482.

What we have here said would apply with equal force to the second proposition, were it not for its concluding provision, ''unless some lawfully constituted authority had prescribed a different method.'' In view of this provision, there may well be considered in connection with the second proposition the question of the power of the petitionee to adopt regulations for the conduct of its business and the operation of its plant.

[2] The Commission correctly held that G. L. 5066, as

amended by No. 129, Acts of 1919, and by No. 92, Acts of 1923, pertains solely to the subject-matter of rates.   It has no relation to regulations affecting precedent conditions a substantial compliance with which may be made essential to an applicant's right of service.   The Legislature has not seen fit to prescribe regulations of this character, nor to place express restrictions upon what a public service corporation may do in such behalf by the common law, or under implied powers fairly regarded as incidental to its express powers granted.   The Commission states with substantial accuracy the general rule of law in this respect; but it does not recognize that the implied powers of the petitionee are broad enough to authorize it to adopt regulations, essentially conditions precedent to be performed by the applicant before he is entitled to the service demanded and before the former can be required by law to supply such service.   That the question here stated is at the "parting of the way" is seen from the following findings of fact and holdings by the Commission:

"It is true that in the use of such a powerful and destructive elemental force as electricity every reasonable precaution ought to be taken to protect the users and the public; and the rules of the respondent (petitionee) which require the grounding of both the metal conduit and the service wires contained in them, separately, would be reasonable and proper rules to be prescribed and insisted upon by competent authority; but the respondent (petitionee) could not arrogate to itself authority to thus indicate to the complainant (petitioner) as to the use of that which was his own, and the Legislature had not conferred it. "Rules requiring information as to the quantity of current, the location of the premises, and the place of entrance, etc., are reasonable * * * and it is not unreasonable to require that information to be in writing upon blanks furnished by the respondent (petitionee)."

But in the same connection the Commission held that the petitionee had no power to dictate to the petitioner as to the kind of entrance switch box and other appliance which should be installed in his house, or whether and in what manner the same should be equipped with ground connections before the petitionee could be required to furnish service.   To this an exception was saved.

By its franchise the petitionee is authorized to generate, distribute, and supply electricity to the public, and to individuals

for heating, lighting, or power purposes; and under the provisions of G. L. 5689, it shall, when requested so to do, at all reasonable times, sell and distribute the same to any and all persons, companies, etc., desiring to use the same within this State for either or any of such purposes, subject to limitations not now material to mention.    In *Stephen* v. *Smith,* 29 Vt. 160, it was said that the right and duty of the defendants, in running the railroad mentioned, to establish and enforce reasonable regulations for the government of the line, had been frequently recognized by the courts in this country; and that the safety and security of the traveling public, as well as the interest of the railroad itself, required that such right and duty exist and be enforced.    In *Waldron* v. *International Water Co.,* 95 Vt. 135, 112 Atl. 219, 13 A. L. R. 340, it was held that the water company had implied power to make and enforce such regulations as were reasonable and not inconsistent with its duty as a public service corporation under its charter or the laws of the State, citing *Bourke* v. *Olcott Water Co.,* 84 Vt. 121, 78 Atl. 715, 33 L. R. A. (N. S.) 1015, Ann. Cas. 1912D, 108.

[3]    The principle, on which the decisions in the foregoing cases were based, is equally applicable for similar reasons in the case at bar; and we hold that the petitionee, in the service of generating and distributing electrical current, had implied power to adopt reasonable and lawful regulations, without unjust discrimination, for the conduct of its business, binding on its patrons and enforcible against them, even to the extent of refusing service to those who refuse to comply with them.    In *Tismer* v. *New York Edison Co.,* 170 App. Div. 647, 156 N. Y. Supp. 28, the defendant lighting company was held to have such implied power.    This case was carried to the court of appeals, where the judgment was reversed on error found in another respect, but referring to a statute (in its principal feature similar to G. L. 5689, noticed above) requiring electric light corporations to supply electric current for lighting purposes upon the written application of an owner or occupant of premises, within a certain time or suffer the penalty therein named, the court said: ''In spite of this duty (to serve), we do not question the defendant's right to condition its supply of current upon the safety of the customer's equipment, and to establish reasonable regulations for the purpose of assuring itself that the condition has been fulfilled.''    228 N. Y. 156, 161, 126 N. E. 729, 731.    The same

right of regulations by electric companies is declared in the cases following: *Chambers* v. *Spruce Lighting Co.,* 81 W. Va. 714, 95 S. E. 192; *State* v. *Butte Electric & P. Co.,* 43 Mont. 118, 115 Pac. 44; *Akron* v. *McElligott,* 166 Iowa, 297, 147 N. W. 773, Ann. Cas. 1916E, 692. See also 20 C. J. 333; 2 Wyman, Pub. Serv. Corp., § 861. And, says Mr. Wyman (section 863), the power to make regulations includes the power to suspend, or modify, or alter them, or to do away with them altogether, keeping within the limitations of the original power.

[4]   The petitionee refused to connect the petitioner's house with its distribution system and to furnish current as requested, setting forth as the reason of its refusal that the petitioner had not installed the kind of entrance switch box provided for in its "General Service Requirements," and had not provided ground wires in accordance with the terms of said requirements.

The "General Service Requirements," mentioned, which became effective July 1, 1922, provide for a service entrance switch box as follows: "The standard type of service entrance switch box for lighting services approved by the company shall be of metallic construction not less than No. 16 gauge. The dimensions as measured on the inside of the box shall be not less than six and one-half inches wide, eight inches long and three inches deep. The box shall be provided with a device inside the cover for locking switch handle in open position. The box cover shall be provided with a sealing device. The box shall have a removal meter trim end plate, which shall be adapted for use with the company's standard watt hour meter, namely, General Electric type 1-14. The switch inside of box shall be provided with meter testing clips and operated by an insulated handle on the outside of the box." And by a rule of the petitionee, found on page 20 of its "Tariff V. P. S. C. No. 1," which includes "Rules and Regulations for Electric Light and Power" (hereinafter referred to as "Rules and Regulations"), and was duly filed with the Public Service Commission and became effective May 1, 1921, under the caption "Grounding of Service Entrance Switch," there is the provision: "In every installation two ground wires shall be installed, one connecting to service wires and the other to the metallic conduit. They shall be independent of each other and securely mounted in an approved manner. Final connection of the service ground wire at the service

entrance switch shall be made by the meter man of the above companies; all other ground connections shall be made by the consumer or his contractor.''

By the second paragraph of rule (3) of its ''Rules and Regulations,'' ''The company shall not be required to connect to its mains or to continue to render service to the wiring and equipment of the consumer unless such wiring and equipment are installed and maintained in accordance with the requirements of The New England Insurance Exchange, the Constituted Authorities and the Company.''

The wiring equipment of petitioner's house made provision for connection with petitionee's main by means of a metal pipe conduit passing under the eaves of the house and along the outer wall to the place of entrance, thence through the wall of the house to the switch box. Inside of this pipe the service wires leading from the main to the service box were inclosed. The service wires were insulated with a covering sufficient to withstand the ordinary voltage used in house lighting, if the covering remained intact; but not sufficient to resist the voltage usually transmitted over the mains.

The entrance switch box, as installed and equipped by the petitioner, afforded no connection between the service wires and the ground, whether the switch was open or closed, but in order to complete the ground it was necessary to attach a wire about four inches in length to the strap latch and switch lever at one end and to the service wire at the other end, and if this attachment to the service wire was made on the line side of the switch, the service wire would be grounded whether the switch was open or closed.

The distribution system of the petitionee in Manchester, carries on its wires from the power station to transformers set on poles in the streets, an electric current of 2,300 volts. At the transformers this current is reduced to 110 volts, at which voltage it is carried by the service wires to the users.

When neither of the service wires is grounded and the switch is closed, if the wires leading from the transformers in the street into the house by any means become charged with the high tension current, the whole wiring system into and within the house is charged with the same high tension current, and a person touching the wires or other electrical apparatus in the house may receive such high tension current and be killed or injured; such

high tension current may also jump from the wires and other apparatus charged with it to any other conductor which happens to be near enough, and thereby start fires. But if a ground to one of the service wires is installed, any high tension current with which the service wires may become charged passes off through the ground wire to the earth if that ground wire is sufficient, and a person touching the wires or apparatus in the house can and will receive only the small voltage of electricity, supposed to be 110 volts, carried by the service wires for domestic lighting and power purposes, unless in some way he makes a better grounding connection than is made by the grounding wire.

The switch box installed by the petitioner inside the house into which the service wires entered, was what is known as the "Square D Safety Switch." This was constructed of porcelain and was not a conductor of electricity. The metal pipe (conduit) through which the service wires passed was not electrically connected with the switch box, but terminated in a porcelain insulator above the box. This metal conduit as located on the outer wall of the house and the point of entrance was about ten feet above the ground; and was not connected with the ground at any point by a ground wire.

The wiring requirements of the New England Insurance Exchange referred to are, so far as material here, as follows:

Rule 15 A, paragraph n: "If * * a conduit system * * consists of several separate sections, the sections must be bonded to each other, and the system grounded, or each section may be separately grounded * * * The armor of conduits, * * * must either be securely fastened in outlet boxes, junction boxes and cabinets, so as to secure good electrical connection, or the separate sections, boxes and cabinets must be separately grounded."

In rule 28, paragraph "f" under the general head of "Interior Conduits," is this provision: "Must have the metal of the conduit grounded as required in No. 15 A with the exception of short runs of conduit as permitted by Section (n) of that rule." By the short run provision here referred to: "Where runs of—conduit—not over 25 feet long—are used for the protection of wires and are installed in other respects in accordance with Rule—28—these runs need not be grounded if the runs of—conduit—are insulated from ground and from metal conduit—

and metal work on the premises and are either isolated or guarded when within reach from grounded surfaces."

The metal conduit of the petitioner was less than 25 feet in length.

The entrance switch box installed by him was the same or similar to those commonly installed by electricians, including the petitionee prior to May 1, 1921, and now in general use, without the grounding of the conduit; and the servants of the petitionee have made similar installations since that date.

The petitionee, disclaiming any intention to discriminate against the petitioner, announced its policy to standardize interior wiring and service connection with a view to improve the service and lessen the danger to the persons and property of its consumers. It disclaimed any benefits to itself resulting from a compliance with its rules.

The petitionee insisted that, as a preliminary to furnishing service to the petitioner, he install a certain kind of entrance switch box or its equivalent, a sample of which was an exhibit in the case and made a part of the findings. This switch box is a part of the petitionee's proposed standard system of inside wiring. It is of metallic construction. The metal conduit enters the box and is securely connected therewith by physical contact. Provision is made for grounding separately both the metal conduit and the service wires. Some other features of superiority over the box of the petitioner are claimed; but the principal advantage claimed is that both the conduit and the service wires are at all times grounded so that danger of electric shock to the person or damage to property by fire is thereby reduced.

The cost of the petitionee's switch box is from $3.50 to $4.00 and the installation thereof about $1.50 greater than the same expenses in connection with petitioner's box; the extra ground for the conduit would cost about $3.00, all of which would be borne by the petitioner.

[5] Since the petitionee had implied power to adopt reasonable and lawful regulations for the conduct of its business, and since it appears from the findings that the rules of the petitionee, requiring the grounding of both the metal conduit and the service wires contained in them, separately, were reasonable and proper to be prescribed and insisted upon by the service company, and since it also appears that the rules requiring information as to the quantity of current, the location of

the premises, and the place of entrance, etc., are reasonable, and it is not unreasonable to require such information to be in writing on blanks furnished by the company, it becomes necessary to inquire whether such rules are discriminatory as alleged in the petition. It is found that the entrance box installed by the petitioner was the same or similar to those commonly installed by electricians including the petitionee, prior to May 1, 1921, and now in general use, without the grounding of the conduit; and that the servants of the latter have made similar installations since that date. In this connection it should be borne in mind that on the day last named, the petitionee's "Rules and Regulations" became effective, which require, as before observed, two ground wires to be installed in every installation, independent of each other and securely mounted, one connecting to service wires and the other to the metallic conduit. What the entrance switch box in use by the petitionee or under its electric system was, before those "Rules and Regulations" took effect, does not appear, and so the one then commonly installed may not have been materially different from the one prescribed by the petitionee's rule then in force, if it had a rule on that particular subject. For aught appearing the requirements of the rules and regulations which went into effect on that day may have been different in this respect from those previously existing. If an essentially different rule in such respect went into effect that day, then the prior installments of a different switch box constituted no discrimination under the new regulations; nor would the continued use of the particular switch boxes so previously installed, after the new regulations became effective, necessarily work an unjust discrimination. Again, the petitionee's "General Service Requirements," which became effective July 1, 1922, particularly specified that "The standard type of service entrance switch box for lighting services approved by the company shall be of metallic construction," etc. Whether any of the entrance switch boxes installed by the petitionee since the last named date are materially different from those specified in its regulations now existing, does not appear. As already observed, the power to make regulations includes the power to suspend, modify, or alter them. It cannot be said that the facts found show any unjust discrimination against the petitioner.

In *State* v. *City of Waseca*, 122 Minn. 348, 142 N. W. 319, 46 L. R. A. (N. S.) 437, the city owned and operated an electric

light and power plant, which was installed for the purpose of furnishing electric light and power to its inhabitants. It was held that, as the city had undertaken to furnish a public utility, it was to be governed in its duties and obligations and in its rights and privileges by the same rules that apply to private persons or corporations doing the same class of business; that it could not arbitrarily dictate to consumers what appliances they should use, nor direct what selection they should make as between appliances in common practical use,—the difference in detail between those there in question being "not important." But that case is materially unlike the one at bar; for in the latter, the difference between the wiring and equipment installed by the petitioner and that required by the regulations of the petitionee, as seen, is important in the interest of greater safety to persons and property.

We need not inquire as to the general rule of liability of an electric company which simply furnishes electricity, for injuries to person or property caused by defective conditions of the wiring or appliances on private premises, where the wiring and appliances were put in, owned and controlled by the owner or occupant of the building; for knowledge of the defective and dangerous condition of such wiring or appliances by the company thereafter supplying the electricity, as in the case at bar if such defects existed, will charge it with liability for the injuries so caused. 20 C. J. 364, 365; *Pressly* v. *Bloomington & N. R. & Light Co.*, 271 Ill. 622, 111 N. E. 511; *Drury* v. *East St. Louis Light, etc. Co.*, 194 Ill. App. 121; *Hoffman* v. *Leavenworth Light, etc. Co.*, 91 Kan. 450, 138 Pac. 632, 50 L. R. A. (N. S.) 574; *Power Co.* v. *Mfg. Co.*, 180 N. C. 597, 105 S. E. 394; *Aurentz* v. *Nierman*, 76 Ind. App. 669, 131 N. E. 832; *Benson* v. *Am. Ill. Co.*, 102 N. Y. Supp. 206.

The reason for this rule is stated in *Corpus Juris*, on page 365, by quoting from what the court said in *Hoffman* v. *Leavenworth Light, etc. Co.*, as follows: "From the time of acquiring such knowledge the seller's contract duty can not be required save on condition that such defect be remedied, for otherwise it must thenceforward furnish a dangerous force knowing that life and limb might be imperiled by reason of such defect, which neither a contract nor the law nor the common instincts of humanity could require of any one."

And according to Mr. Wyman (volume 1, §§ 20-22) the

well-known principle of the right of self-protection underlies the right of an electric company to refuse to make connections with a building owned, occupied and wired by a third person, known by the company to be improperly wired or equipped for lighting, upon the ground of their possible liability for injuries suffered by another in consequence thereof. The case last cited is referred to in support of the text, also the case of *Bastian* v. *Keystone Gas Co.*, 27 App. Div. 584, 50 N. Y. Supp. 537.

We hold that the petitioner was not in law entitled to have his said house connected with the petitionee's distribution system and to be furnished electric current as he requested, for that he had not substantially complied with the reasonable and lawful regulations of the petitionee as to the kind of entrance switch box to be installed, nor in installing ground wires.

*Exception sustained, the order of the Public Service Commission is vacated and set aside, and petition is dismissed with costs to the petitionee.*