153 So. 729

### ALABAMA POWER CO. v. EMENS.

### 8 Div. 505.

Supreme Court of Alabama.

March 1, 1934.

Rehearing Denied April 12, 1934.

Martin, Thompson & McWhorter, of Birmingham, and Eyster & Eyster, of Decatur, for appellant.

Wert & Hutson and E. W. Godbey, all of Decatur, for appellee.

BROWN, Justice.

Action on the case against a public service corporation engaged in the business of generating and distributing electricity and selling and installing electrical equipment for domestic use, by one of its patrons, for damages resulting from the destruction of the plaintiff's residence and its furnishings by fire alleged to have been communicated to said building as the proximate consequence of defendant's negligence.

The case was submitted to the jury on count 1 of the complaint, and the plea of the general issue. Said count, after averring the character of the business in which defendant was engaged, averred that some time during the year 1930, plaintiff purchased from defendant an electric stove which defendant undertook and engaged to "properly install" in plaintiff's residence, and did install said stove, together with necessary "electric switches, fuses, and wires," and agreed to maintain the same for a reward to be paid by plaintiff; that after such installation defendant maintained said stove, switches, fuses, and wires, and plaintiff paid such sums as were charged by it for said service; and further avers: "That on or about the 30th day of September, 1930, she was a customer of the defendant, and defendant was furnishing to her electricity for her said home for illumination and heating and other domestic purposes, by means of certain feed or cut-in wires leading from its transmission lines to said switches. And plaintiff further avers that such connections and equipment, and pretended service under such agreement, con-

tinued until the destruction of said house and said contents by fire, as hereinafter stated. [Defendant owed to plaintiff the duty to supply electricity to her said house of a voltage that was reasonably safe and only such as was reasonably safe and was necessary to light her said home and for said other purposes]; *and plaintiff further avers that defendant was guilty of negligence in and about the installing and maintenance of said stove, switches, fuses, and wires, and that as a proximate result of defendant's said negligence, the electric wires in plaintiff's house, on or about the last of September, 1930, became heavily and dangerously charged with electric current and ignited and set plaintiff's house and contents on fire, burning and completely destroying same.*" (Brackets and italics supplied.)

▆▆ Appellant insists that the plaintiff has embodied in said count 2 causes of action—ex contractu, for failing to properly install and maintain, and ex delicto, for furnishing current of electricity of a higher voltage than was reasonably safe for the purposes contemplated by its engagement.

In support of this contention some importance is attached to the averment of the count embraced in brackets, which we regard as nothing but an averment of the pleader's conclusion, neither adding to nor detracting from the averment of fact constituting the inducement out of which the duty springs as a matter of law, the breach of which is stated in the averments above italicized, and which constitutes the gravamen of the count.

It is well settled that on demurrer the averments of the pleading will be construed most strongly against the pleader and all intendments resolved against him. Montgomery Light & Water Power Co. v. Thombs, 204 Ala. 678, 87 So. 205; Walker v. Alabama, Tennessee & Northern Railway Co., 194 Ala. 360, 70 So. 125, 126; Southern Railway Co. v. Hanby, 183 Ala. 255, 62 So. 871; Western Ry. of Alabama v. Madison, 16 Ala. App. 588, 80 So. 162; Stewart v. Smith, 16 Ala. App. 461, 78 So. 724.

Nevertheless the character and sufficiency of the pleading must be determined by the averment of fact, and mere conclusions of the pleader as to the duty arising from the facts are treated as surplusage. Ragsdale v. Kinney, 119 Ala. 454, 24 So. 443; Indemnity Co. of America v. Bollas, 223 Ala. 239, 135 So. 174.

The count avers that the stove and equipment were installed and maintained, "but that defendant was guilty of negligence in and about the installing and maintenance of said stove, switches, fuses and wires," not a breach of the contract, but *misfeasance* in its performance proximately resulting in injury to plaintiff. 40 C. J. pp. 1222, 1223; Mobile Life Insurance Co. v. Randall, 74 Ala. 170; Southern Railway Co. v. Jones, 132 Ala. 437, 31 So. 501.

The contention of appellant is, therefore, without merit.

The evidence is without dispute that the defendant is engaged in the business of generating and distributing electricity, as a public service, and there was evidence going to show that it sells and installs electric stoves and other electrical equipment in the homes of its customers, and distributes to them electricity for domestic use. That it sold to plaintiff an electric stove and agreed for a consideration to install the same in plaintiff's residence, with suitable switch boxes, fuses, and cable leading to and supplying said stove with electricity for such uses as said stove was adapted to. That defendant first sold and delivered to plaintiff and installed a small stove, which was later exchanged for a larger stove.

The plaintiff adduced evidence tending to show that the cable leading from the switch box to the stove was brought in under the floor of the kitchen and brought through the floor behind the stove at a "right angle." That said cable referred to as a "BX" consisted of three No. 6 copper wires insulated and inclosed in a flexible steel cable.

There was expert testimony tending to show that the correct method of bringing the cable up through the floor is to make a curve first down from the floor and make another curve up through the floor; that turning abruptly up through the floor at a sharp angle tended to break the insulation on the wires inclosed in the steel cable, and if the insulation was injured this would cause the current to leak through the insulation, burn away the steel covering, and eventually cause a "short" in the electric current, which would blow the fuses and interrupt the service. That another effect of such leakage through the broken insulation would be to generate heat at this point which would ignite inflammable material.

There was further evidence that plaintiff's residence which had been standing for a number of years was constructed of pine lumber and plastered on the inside over wooden laths; that a short time before the fire was discovered the plaintiff turned on the stove to heat some water for the doctors who

were treating plaintiff's husband who was at the time ill; that when plaintiff turned on the stove there was nothing burning in the kitchen and no odor of burning material, but a short time thereafter, when she returned to the kitchen, the kitchen wall back of the stove was in flames from the top of the stove up, and had burned through so that, as one witness stated, he could see through and see the laths burning. Immediately upon the discovery of the fire the doctors attending plaintiff's sick husband hastened to get him out of the house, and one of them testified that just as they got him outside the lights in the house and in the town all went out. This resulted, as the evidence shows, from a short circuit blowing out the fuse in the transformer, where the current was "stepped down" from 6,900 to 230 volts, for domestic use. The flame spread, and in a short time the building with its contents was destroyed by the fire.

The plaintiff also offered evidence tending to exclude other sources or causes of fire, showing that the coal range in the kitchen had not had any fire in it for several hours; that the coal range was in the southwest corner of the kitchen, and the electric stove and the fire when first discovered were north of the coal range; that the electric stove was only a few inches from the wall of the kitchen where the fire apparently originated.

The cable leading to the stove was disconnected and removed after the fire by the defendant's agents and carried to the defendant's office for examination by its engineers, and was kept by defendant in its possession, and said cable or a portion thereof was brought into court during the trial and some of the witnesses testified in respect to its condition; and the testimony goes to show that a hole had been burned through the steel casing of the cable, and there was testimony tending to show that the hole was caused by a leakage of the current heating the cable to a melting point where the hole was discovered.

The evidence shows that the house was wired for lighting purposes and also for the stove. The light wires were designed to carry a voltage of from 110 to 120 volts, and the stove cable a voltage of from 220 to 250 volts. Expert testimony was offered going to show that the lighting system and the heating system of wires should be controlled by separate switch boxes, and the evidence was in conflict as to whether two or only one switch box was installed when the stove was placed in the building. There was also evidence going to show that excessive heat from electricity is not caused by excessive voltage, but by excessive amperage, and that a short in the system increases the amperage.

The electricians who installed the wiring in plaintiff's residence testified, in behalf of defendant, in detail as to the method of installation, that they were at the time employees of the Twin City Electric Company of Trinity, who installed the stove "for the Alabama Power Company," and were paid by the Power Company for the installation and the material used in the work. These witnesses, and others examined by the defendant, tended to show that the work was done in accordance with the rules of good practice, but J. A. Henderson testified that all stoves being put in at the time of the trial were "not put in like that one * * * they are putting them in differently."

Defendant's witness Lepard, in the employ of the defendant in 1929 and 1930, testified, in short, that he was "service man" in 1929, connected the current to the house wiring in the plaintiff's residence; that he "connected meters, set meters and did repair work on ranges, refrigerators and caught trouble; just whatever happened. When a customer had a complaint I would usually go and try to fix it. I remember serving the job down at Trinity. I went there representing the Power Company and connected up the wires of the Power Company to the wiring of the house. That is done on the outside right where this condulet is located, and I installed and connected the meter. The meter is the instrument by which there is registered the amount of electric energy consumed. I set the meter directly on top of the switch box and that meter registered both the amount of current used for lighting purposes and heating purposes. I installed that meter. I installed it properly with a proper meter and the same kind as used by well-regulated companies at that time, it was standard equipment. The meter box was connected, it was screwed to the wall. I made an inspection of the switch box. I found it was all right, the fuses were in it; I made an inspection with reference to the ground wires, their condition was all right. That was in 1929 when the service was first established. I went over the range installation. In my judgment it was properly installed, was of the proper material, of the size and dimensions and kind and standard that it should have been installed with and such as meets the underwriters' require-

ments. Then I made a thorough inspection of the whole job and after I found it all right I connected the company's wires to the house wiring out there under the eave. So far as I know I was the last man of the Power Company that had anything to do with it. Excessive current in a wire will have an effect on the insulation ōn it, if you overload the wire. You can overload one until the heat will affect the insulation."

And on cross-examination: "I inspected another range over in the back part of town. I have forgotten the man's name. I don't know why I remember the details of this, I just remember it. I didn't crawl under the house. I know how the BX cable was attached to the house. I could get down there and look at it. It was run under the house, attached to the rafters. I don't remember whether there was a lattice around that house. There was an opening there, I could see under the house. I don't know the directions in Trinity or which side of the house I looked under. I could show you if I were there. I was on the side next to where the pole stood that serviced the house. There was a little porch that run around the back side and kitchen back towards the back of the house, and there was a room as well as I remember behind the kitchen, and the porch run over to an ell; the porch was made into a room. I don't know that there on the side where the pole is that there is a well there and that is boxed up to where you couldn't see under the house on that side, I don't remember where the well was. I remember that there was a porch that was all boxed up, that is next to the house, that is, boxed up, but I didn't go in there, but you could see how it was connected from the outside. The BX cable was run across the house, that is, they were running away from me up and down, like I was looking this way. That was under the main house where I was noticing, I was not even with the stove when I looked under. The cable ran diagonally across. I didn't look under where the switch box was attached to the house. The switch box was fastened inside the wall there. I got under the floor and looked under the edge of the house and could see the cable all the way. I could see the cable. I didn't look through a lattice, the floor was open. 'Q. Could you have seen a break on a cable that far under the house? A. I don't know, I didn't see one. I looked at this box, I connected the meter on the box, I didn't take those fuses out. They were regular sixty amp. fuses and I didn't take them out. I don't know whether they were defective fuses with something

back of them or not. After I made my inspection I know they were good fuses, I looked at them.' "

Defendant's witness Woodward testified in part: "When I took the larger stove down there I put the BX cable up through the floor there for connection with the stove. I made a proper connection there with it and that was all there was to be done, just disconnect one and take it out. It was just to take one loose and connect the other."

The plaintiff offered evidence showing that repairs were made on the electric equipment about the electric stove, or wires connected therewith by the defendant's agents or servants, and the bill for repairs was included in the bills for electricity furnished, and was paid by or for the plaintiff.

The defendant offered evidence going to show that its general service stopped where the connection was made to the house wiring, that the wiring in the house and connections at the house were "in accordance with underwriters' specifications and requirements."

■ The law is well settled that persons and corporations engaged in the business of generating and distributing electric current are liable for damage to property proximately resulting from the negligence of their servants or agents acting within the line and scope of their employment. Birmingham Ry., Light & Power Co. v. E. & W. Dry Cleaning. Co., 16 Ala. App. 328, 77 So. 922; Susquehanna Transmission Co. of Maryland v. Murphy, 131 Md. 340, 101 A. 791; 20 C. J. page 363, § 48.

■ And the general rule is that where wiring or other electrical appliances on private premises are owned and controlled by the owner of the premises, one who merely furnishes electricity is not responsible for the insulation or condition of such wiring or appliances, and is not liable to such owner for injury or loss caused by their defective condition. 20 C. J. p. 364, § 49.

■ It is likewise well settled that where the distributor has knowledge of a defective condition of the wires and thereafter continues to furnish current, proximately causing injury and damage, it is liable. Alabama Power Co. v. Jones, 212 Ala. 206, 101 So. 898; 20 C. J. p. 365, § 49; Smith's Administratrix v. Middlesboro Electric Co., 164 Ky. 46, 174 S. W. 773, Ann. Cas. 1917A, 1164, and note; Hawkins v. Vermont Hydro-Electric Corporation, 98 Vt. 176, 126 A. 517, 37 A. L. R. 1359.

■ And where the distributing company not only supplies the current, but also con-

trols the wiring or other appliances, it is responsible for their condition, and liable for negligence, although it does not own such appliances. Daltry v. Media Electric Light, Heat & Power Co., 208 Pa. 403, 57 A. 833; 20 C. J. pp. 365, 366, § 49.

And where such distributor installs the wiring or appliances, and such wiring or appliances are defective in consequence of the negligence of its agents, servants, or employees, and the loss or injury proximately resulted therefrom, it is liable. Minneapolis General Electric Co. v. Cronon, 166 F. 651, 92 C. C. A. 345, 20 L. R. A. (N. S.) 816; Elias v. Mayor & Board of Trustees of City of New Iberia, 137 La. 691, 69 So. 141.

So, also, where an electric company engaged in distributing electricity sells and installs electrical equipment and engages to furnish current therefor and keep the equipment in repair, it is liable for negligence in respect thereto. 9 R. C. L. p. 1205, § 15; Fish v. Kirlin-Gray Electric Co., 18 S. D. 122, 99 N. W. 1092, 112 Am. St. Rep. 782; Thomas, Adm'r, v. Maysville Gas Co., 108 Ky. 224, 56 S. W. 153, 53 L. R. A. 147.

Where, as in the case at bar, a person engaged in the business of generating and distributing electricity for domestic and other uses also sells and engages to install electrical equipment in the residence of one of its patrons, and supply its current therefor for domestic use, it must exercise the care of a reasonably prudent man skilled in the practice and art of installing such equipment, according to the state of the art or method generally used by persons engaged in like business at the time the work is done. Herzog, as Receiver, etc., v. Municipal Electric Light Co., 89 App. Div. 569, 85 N. Y. S. 712.

As the court observed in the Herzog Case, supra, the obligation assumed and the duty arising out of such circumstances are not unlike that resting upon a physician or surgeon called to professionally attend his patient, "to exercise such reasonable care' and skill in respect to the duty assumed as physicians and surgeons in the same general neighborhood, in the same general line of practice, ordinarily have and exercise in like cases." Robinson v. Crotwell, 175 Ala. 194, 203, 57 So. 23, 26; Alabama Power Co. v. McIntosh, 219 Ala. 546, 122 So. 677.

The duties and responsibilities are analogous to those of a keeper of a restaurant or hotel in preparing and serving meals to its customers—who must exercise the same degree of care that a reasonably prudent man,

skilled in the art of selecting and preparing food for human consumption, exercises. Travis v. L. & N. R. R. Co., 183 Ala. 415, 62 So. 851.

On like principle, the law imposes on a common carrier of passengers "the highest degree of care and diligence which is known to careful, diligent, and skillful persons engaged in such business." Central of Georgia R. Co. v. Robertson, 203 Ala. 358, 359, 83 So. 102, 103.

And it is a general doctrine of the law that where the relations of the parties are such as to impose upon one of them a direct personal duty to the other, such duty cannot be evaded or shifted to the shoulders of an independent contractor to perform the duty. Hoboken Land & Improvement Co. v. United Electric Co. of New Jersey, 71 N. J. Law, 430, 58 A. 1082; Sovereign Camp, W. O. W., v. Feltman, 226 Ala. 390, 147 So. 396; Republic Iron & Steel Co. v. Barter, 218 Ala. 369, 118 So. 749; 29 A. L. R. 736, 737 note.

In Hoboken Land & Improvement Co. v. United Electric Co. of New Jersey, supra, a case in point, it was observed: "These considerations lead to the conclusion that the electric company was bound to exercise due care and skill either in installing the apparatus by its own agents or in examining to see that it had been properly installed by others. The New York Court of Appeals enforced this doctrine in Schmeer v. Gas Light Co., 147 N. Y. 529, 42 N. E. 202, 30 L. R. A. 653, where it was held that the defendant was required, before it permitted gas to be turned into pipes newly installed by other parties, to exercise reasonable care and skill in inspecting the pipes so as to ascertain whether they were in proper condition for use." 71 N. J. Law, 432, 433, 58 A. 1082, 1083.

Our judgment is, when the doctrine stated above is applied to the evidence and its legitimate tendencies, it was for the jury to say whether or not due care was exercised in installing the equipment in plaintiff's home, and, if not, whether the defendant failed to exercise due care to discover the defects before it connected the electric current thereto. Under the evidence and its legitimate tendencies, it was a question for the jury whether or not the fire was communicated to plaintiff's residence by leaking electric current, as a proximate consequence of the negligence of the defendant, its agents or servants.

We are also of opinion that the evidence afforded a legitimate inference that the defendant agreed to maintain and keep the

equipment in repair. As before stated, there was evidence that some repairs were made, and defendant charged. for the same on the regular monthly statement, and the bill was paid.

And defendant's witness Lepard testified: "I worked for the Power Company in 1930. I was in Red Bay, Alabama. I worked for the Power Company in 1929 here. I know the Emens' house [plaintiff's house] down at Trinity. I was service man in 1929. I connected to the house, connected meters, set meters and did repair work on ranges, refrigerators and caught trouble; just whatever happened. When a customer had a complaint I would usually go and try to fix it. I remember serving the job down at Trinity."

The evidence is without dispute that the defendant undertook to install the electric stove and the cable leading thereto for supplying it with electric current, and there is evidence tending to show that the cable was brought up through the floor at a sharp angle, and this method of installation was calculated to damage the insulation on the wires inclosed in the steel casing, and cause the current to leak and melt the casing and communicate fire to the building, and while defendant's "trouble man" who connected the current to the wires testified that he inspected the cable by looking from the outside, under the house, his evidence falls short of showing that he inspected the cable where it was brought through the floor to the stove. There was also evidence showing that the wires of defendant leading from the transformer to the house were not insulated—the insulation had worn or burned off—and while the transformer recorded the voltage, it did not record the amperage, and the overloading of amperage is what caused heat. There was also evidence tending to show that proper installation required two switch boxes, one for the stove cable and a separate box for the lighting system in the house, and only one box was installed. So, regardless of the doctrine res ipsa loquitur, there was evidence from which the jury could find negligence on the part of the defendant, its agents, servants, or employees; and in this sense the Twin City Electric Company, under the doctrine above stated, was defendant's agent. Alabama Power Co. v. Bodine, 213 Ala. 627, 105 So. 869; Sanders v. Gernet Bros. Lumber Co., 221 Ala. 469, 129 So. 46.

The affirmative charges, requested by the defendant, were therefore properly refused. Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257; H. J. Crenshaw & Co. v. Seaboard Air Line Ry. Co., 219 Ala. 206, 121 So. 736.

It has been repeatedly ruled that a general exception to the oral charge of the court, "and each and every paragraph of said charge," is unavailing unless the charge is erroneous in all of its propositions. Syndicate Insurance Co. v. Catchings, 104 Ala. 176. 16 So. 46.

That where the oral charge in some of its aspects goes beyond the terms and scope of the pleading, an exception thereto must be "specific" and separate the objectionable portions from the mass of good and bad. Belt Automobile Indemnity Ass'n v. Ensley Transfer & Supply Co., 211 Ala. 84, 99 So. 787.

That an exception which merely "describes the subject covered by the court in its oral charge" is unavailing to support an assignment of errors. Birmingham Railway, Light & Power Co. v. Friedman, 187 Ala. 562, 65 So. 939; Conway v. Robinson, 216 Ala. 495, 113 So. 531.

Many of the appellant's exceptions to the oral charge are not sufficiently specific, and do not support the assignment of errors.

■ The portion of the oral charge of which appellant complains is:

"As I have said, it may not be the sole cause, but it must be one of the causes, and such case in such sort as aids and assists directly in bringing about the result, though there be no direct evidence showing that electrical appliances being used were in such condition as to permit the short circuit of the current, but the evidence does show that the appliances were owned and operated by the defendant, that is, when it is so shown by the evidence then the circumstances of the accident at least imposed upon the defendant the duty of showing that it was properly constructed and installed and incapable of communicating a current of deadly or dangerous force. That duty again though is measured by what an ordinarily prudent man would do under like circumstances. Defendant having supplied the wire and appliances to convey into plaintiff's house electricity for domestic and like purposes and uses, and injury having attended its use, the duty was on the defendant to negative its negligence in the matter. I don't mean to say or to be understood by that, that the duty is on the defendant in the first instance to show that it is not negligent. That duty rests on the plaintiff to start on and that duty is on the plaintiff all through this case. The duty is on her to reasonably satisfy you that the defendant was guilty of negligence, but as I have just stated here, if you are reasonably satisfied from

the evidence in this case that this fire here in question was caused by reason of an electric current coming into that house over the wires connected therefor, then gentlemen of the jury, the law steps in and for at least administrative purposes we might say, says that the plaintiff could rest her case right there. She has made out what the law calls a prima facie case. A presumption of negligence from those facts arises, but that presumption, gentlemen, is not an absolute one. It is not one that forbids overturning or explaining the meaning. It is subject to explanation, and it is explained and met whenever the defendant introduces evidence in the case, or there is evidence in the case, whether it comes in here by the defendant or by the other party, that reasonably satisfies your minds from the evidence, as I say, that there was no defect in the wiring and no negligence on the part of the defendant with reference to the matter.

"It is not that in any case negligence can be presumed by the mere fact of an accident and an injury, but in these cases the surrounding circumstances which are necessarily brought into view by showing how the accident occurred contain without further proof sufficient evidence of the defendant's duty and of his neglect to perform it. These facts and attending circumstances by themselves furnish all the proof that the injured person is able to offer or that is necessary to be offered in the first instance.

"Where the thing is shown to be under the management of the defendant—mark the language, gentlemen—where the thing is shown to be under the management of the defendant or its authorized servant and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence in the absence of explanation by the defendant, that the accident arose from the want of proper care. As I have said, this principle raises a mere rebuttable presumption of law—a presumption of administrative procedure. When evidence is introduced on the point covered by the presumption of law, it is *not* functus officio so far as sustaining the burden of evidence is concerned, *and this presumption drops out of sight, and out of the case.* [Italics supplied.]

"Dealing with this presumption further: When this presumption of law is met by explanatory evidence uncontradictory in itself, that would be a sufficient explanation. If there is a conflict in the explanatory evidence —when I say a conflict in the evidence, I al-

so mean to go further than that and say a conflict in the legal inferences that may be drawn from the evidence—then its weight is for you to determine, gentlemen of the jury."

This portion of the court's charge, abstractly considered, seems to be in line with the doctrine res ipsa loquitur, restated in Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257, and Louisville & Nashville Railroad Co. v. Marbury Lumber Co., 132 Ala. 520, 32 So. 745, 90 Am. St. Rep. 917, except in the use of the word *not*, above italicized; but this was corrected in the language immediately following, and the most that can be said of this portion of the charge is that it was probably misleading. See, also, Alabama Power Co. v. Davidson, 206 Ala. 501, 90 So. 915; Alabama City, G. & A. Ry. Co. v. Appleton, 171 Ala. 324, 54 So. 638, Ann. Cas. 1913A, 1181; Town of Athens v. Miller, 190 Ala. 82, 66 So. 702; Bloom v. City of Cullman, 197 Ala. 490, 73 So. 85; McAllister v. Pryor et al., 187 N. C. 832, 123 S. E. 92, 34 A. L. R. 25 and note 31, 32.

Special charges asserting that the defendant was not liable for injury resulting to plaintiff through the negligence of the alleged independent contractor, on principles heretofore stated, were well refused.

██ Whether from a scientific standpoint the fire was caused by excessive voltage or excessive amperage, overloading defectively installed or negligently maintained wires and equipment, proximately causing the fire, was the substance of the issue. The law only requires that the substance of the issue be proven. Wilson v. Smith, 111 Ala. 170, 20 So. 134; F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So. 630. Defendant's special charge 19 was therefore well refused.

██ Charge 27 was covered by the oral charge of the court, and charges 11, 14, and 15 given at defendant's request. Charge 30a (Record; page 135) is argumentative, and was refused without error. Charge 33 was refused without error for the use of the word "believe" instead of reasonably satisfied, and was also calculated to confuse.

██ We are not able to affirm that the verdict of the jury is against the great weight of the evidence, and that the motion for a new trial should be granted.

We find no reversible errors. The judgment of the circuit court is affirmed.

Affirmed.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.