16932

ROY CARROWAY, Respondent, v. CAROLINA POWER & LIGHT COMPANY, Appellant

(84 S. E. (2d) 728)

*Messrs. Willcox, Hardee, Houck & Palmer,* of Florence, and *A. Y. Arledge,* of Raleigh, N. C., *for Appellant,*

*Messrs. McEachin, Townsend & Zeigler,* of Florence, *for Respondent,*

November 18, 1954.

OXNER, Justice.

This is an action to recover damages for unlawfully entering the premises of plaintiff and removing his electric meter, and for wilfully and wantonly discontinuing his electric service. Defendant denied committing a trespass and asserted that it was justified in removing the meter and cutting off the current because of the dangerous condition of the electrical wiring in plaintiff's residence. The trial resulted in a verdict in favor of the plaintiff for $200.00 actual damages and $275.00 punitive damages. From the judgment entered thereon, defendant has appealed on a number of exceptions, but we need only consider whether the trial Judge erred in refusing its motion for a directed verdict upon the ground that the undisputed evidence showed that defendant lawfully removed the meter and was justified in discontinuing the supply of electrical current to plaintiff's home.

On April 15, 1950, plaintiff, who then had just rented from M. Rosenfeld a house located at 602-B South Jarrott Street, in the City of Florence, applied to defendant for electric service, executing the usual service, agreement. Defendant promptly installed a meter and commenced supplying electricity to this house. There was no interruption of the service until July, 1952.

On Saturday, July 12, 1952, the wiring in another house owned by Rosenfeld and occupied by a tenant, which was next door to the one in which plaintiff lived, caught on fire. The Fire Department was called. The blaze was promptly extinguished and apparently little damage was done. On the following Monday morning, July 14th, the Chief of the Fire Department requested the Electrical Inspector for the City of Florence to go with him to the place of the fire and inspect the wiring in the houses in that vicinity. Around 11:00 o'clock that morning, the Electrical Inspector, accompanied by the Fire Chief, examined the wiring in plaintiff's residence and several other houses owned by Rosenfeld. He concluded that it was defective and constituted a fire hazard. On his way back to the City Hall about noon, he went by the office of Rosenfeld's property manager and discussed the

situation. The record does not disclose what transpired between these parties as their conversation was excluded on motion of plaintiff's counsel. It is fair to assume, however, from the record that Rosenfeld's property manager was advised of the condition of the electrical wiring in these houses. Evidently the Electrical Inspector received no assurance that the condition would be immediately remedied, for upon arriving at City Hall, he promptly called defendant's assistant manager and told him to disconnect the electric current running into plaintiff's residence. Defendant's assistant manager requested that these instructions be put in writing. In accordance with this request, between 1:00 and 2:00 P. M., the Electrical Inspector wrote a letter to Rosenfeld in which he stated that "at the request of the Chief of the Florence Fire Department", he had made an inspection of the houses owned by Rosenfeld at 602-A South Jarrott Street, 602-B South Jarrott Street, 604 South Jarrott Street and 500 Walnut Street, which disclosed "that the electrical wiring in each building is in an extremely dangerous condition and that corrections must be made." After pointing out the particulars in which the wiring was defective, he further stated that a copy of the letter was being sent to Carolina Power and Light Company, which would "serve as their official notice to immediately discontinue service" at the houses on South Jarrott Street. He further advised Rosenfeld that the Carolina Power and Light Company would be notified to reinstate service to these houses "upon satisfactory completion of the necessary correction", and, further, that unless corrections were made at the house on Walnut Street within fifteen days, the Carolina Power and Light Company would be notified to discontinue the service at this house.

This letter was promptly dispatched by a policeman to Rosenfeld and a copy delivered to defendant's assistant manager, who immediately ordered his service foreman to carry out the instructions. According to the latter's testimony, he went to plaintiff's residence about 3:00 o'clock that afternoon, and after explaining the situation, removed the meter

and cut off the current. Plaintiff and his wife testified that this employee of defendant entered their premises without permission, and without previous notice removed the meter located at the corner of their house and disconnected the current. They stated that they told him that one of their children was sick and requested him "to give us time to go see Mr. Rosenfeld and see what was the trouble," but the service foreman refused to do so.

On Thursday, July 17, or three days after the current was cut off, defendant, upon being notified by the city authorities that the necessary repairs had been made, installed the meter and a new switch box in plaintiff's home and reconnected the current. While the cause of this delay in correcting the situation is not disclosed by the record, it could not be attributed to defendant or the municipal authorities because no duty rested upon either to make these repairs.

It is conceded that plaintiff was not in arrears with the payment of his electric bill at the time his service was disconnected. The sole question for determination is whether the defendant was justified in cutting off the service because of the dangerous condition of the wiring. Stated differently, under the circumstances mentioned, did the duty of the defendant to supply electricity to plaintiff's home end, and there then arise a higher duty to protect the property, safety and lives of the public? Defendant seeks principally to justify its conduct under an ordinance of the City of Florence and certain rules and regulations hereinafter discussed, but it might not be amiss to first review the duty and obligation of the defendant at common law.

We have had occasion to point out that "electricity is a very dangerous thing", and that "power companies and their employees, even more than all other people, ought to know the great danger of electricity." *Weeks v. Carolina Power & Light Co.,* 156 S. C. 158, 153 S. E. 119, 122. The degree of care must be commensurate with the danger involved. Since the electric wires in plaintiff's home were not owned or controlled by defendant, it was not

charged with the duty of inspecting same to see that they were in a safe condition and kept so, and ordinarily could not be held liable for any damage sustained as a result of such defective wiring. 18 Am. Jur., Electricity, Sec. 102; 29 C. J. S., Electricity, § 57. If a consumer continues to use the current, knowing that a dangerous situation exists, he assumes the risk consequent upon his conduct. But where a public utility knows that the wiring in a customer's house is dangerous and continues to supply electricity to such home, it incurs liability for the consequences. *Milligan v. Georgia Power Co.*, 68 Ga. App. 269, 22 S. E. (2d) 662; *Hawkins v. Vermont Hydro-Electric Corp.*, 98 Vt. 176, 126 A. 517, 37 A. L. R. 1359; *Oesterreich v. Claas*, 237 Wis. 343, 295 N. W. 766, 768, 134 A. L. R. 499. Also, see annotation in 32 A. L. R. (2d) beginning on page 282. In such a case, "it is the energizing of the line with knowledge of the conditions and not the conditions themselves which forms the basis of liability." *Oesterreich v. Claas, supra.* In *Null v. Electric Power Board of City of Nashville*, 30 Tenn. App. 696, 210 S. W. (2d) 490, 492, the Court said that where such public utility knows of the defective condition, "its duty is to stop and not to send its deadly current to the defective wiring of the consumer, and it is liable for injuries to person or property caused by breach of this duty." The views herein discussed were succinctly summarized in *Hoffman v. Leavenworth Light, Heat & Power Co.*, 91 Kan. 450, 138 P. 632, 636, 50 L. R. A., N. S., 574, as follows:

"In order, therefore, to hold the seller liable, it must appear that it continued to furnish and turn on the dangerous current after knowing that the purchaser had permitted the equipment to become defective. From the time of acquiring such knowledge the seller's contract duty cannot be required save on condition that such defect be remedied, for otherwise it must thenceforward furnish a dangerous force, knowing that life and limb may be imperiled by reason of such defect, which neither a contract nor the law nor the common instincts of humanity could require of any one."

Applying the foregoing principles, the Supreme Court of Alabama, in *Alabama Power Company v. Sides,* 229 Ala. 84, 155 So. 686, held that a power company was not liable in damages for discontinuing electrical service where the undisputed testimony showed that the wiring was defective.

Having discussed the duty of the defendant at common law, we now turn to the rules and regulations pertaining to the question before us.

Rule 1 (g) of the "Service Regulations", on file with ■ and approved by the Public Service Commission, and in effect when plaintiff's service was disconnected, authorized the company to suspend the delivery of electricity to a customer, *without notice,* "in case of a condition on Customer's side of the point of delivery actually known by Company to be, or which Company reasonably anticipates may be dangerous to life or property." Under Rule 12 of these Service Regulations, the company reserved the right to suspend service, without any liability on its part, "in cases where, in its opinion, the continuance of service to Customer's premises would endanger persons or property." In addition to the foregoing Service Regulations, Rule 9 of the Public Service Commission authorizes any public utility to discontinue the service to a customer, *without notice,* "where a dangerous condition is found to exist on the consumer's premises."

The foregoing rules and regulations have the force and effect of law and were binding on the plaintiff, regardless of whether or not he agreed to them. *Woody v. South Carolina Power Co.,* 202 S. C. 73, 24 S. E. (2d) 121; *Miller v. Central Carolina Tel. Co.,* 194 S. C. 327, 8 S. E. (2d) 355, 127 A. L. R. 722; *Plate v. Southern Bell Tel. & Tel. Co.,* D. C., 98 F. Supp. 355.

We think the only reasonable inference warranted by ■ the evidence is that a situation existed which was dangerous to life and property within the contemplation of the foregoing rules and regulations. The Chief of

the Fire Department described the condition of the wiring in plaintiff's residence as follows:

"Q. Did you make an inspection of the wiring? A. Yes, sir.

"Q. What condition did you find it in? A. The sockets were gone, it was just a three room house, each room had a drop.

"Q. It had three drops? A. Yes, they were gone and they had a radio connected to the one in front, just the wires twisted.

"Q. The socket was gone and the radio was connected by tying the wires together? A. Yes, sir, the switch box on the front porch had jumped out, it seems, it had a fuse in it but it wasn't doing any good. The box was pulled off of the wall, kind of hanging on the wall. There was a fuse in it. I pulled the switch myself in the presence of Mr. Riddick and the radio and fan were still running, it had no effect.

"Q. What did that mean to you? A. You have no fuse protection.

"Q. The box was shorted? A. I don't know, you could use the term 'shorted', it was just 110 volt service in the house, you have one fuse, the neutral wire is straight, commonly speaking it is cut straight through, no fuse, it is just a hot wire, you could pull the switch down and the lights, the radio and fan in front room did not go off. I recall the radio played right on. We picked the fuse out and it continued to play.

"Q. After your inspection of this wiring, was that condition in your opinion, was it dangerous? A. Yes, sir, anything that hasn't got fuse protection on it is dangerous, that is what they are for."

The electrical inspector for the City of Florence, after describing the condition of this wiring, testified:

"Q. But you consider this condition—what would you consider the condition with respect to whether it was safe or not? A. I considered it as dangerous.

"Q. What was the danger, in what respect was it dangerous, what were you afraid might happen? A. The lack of fuse protection, over current protection would permit the line voltage or current to come right into the house, it could build right up until your fire actually got started, it could build up in case of trouble on the line, the Power Company's side, to where your power would jump across the wires and it would be a generally dangerous situation for anybody to get into the vicinity of it or touch it.

"Q. It would be dangerous to anybody who might touch it or dangerous too, from a fire hazard? A. Yes, sir."

It is argued that plaintiff's testimony shows that the situation was not so urgent as to require the harsh action of cutting off his service without notice and without giving him a reasonable opportunity to repair his wiring, or at least it is said his testimony made an issue for the jury thereabout. It is true that he testified that the wiring was in the same condition that existed when he moved in the house and that although he had been living there almost two years, the wiring had never caught on fire or given any trouble, but we do not think this has the effect of contradicting the testimony of the experts as to the dangerous condition of the premises. No doubt the tenant who lived in the house next door could have given similar testimony prior to the fire at his house the previous Saturday. Neither the municipal authorities nor the defendant were required to wait until there was a fire before undertaking to make immediate correction. Suppose there had been a delay of a few days in cutting off the current and plaintiff's house had burned down the night after this condition was called to the attention of the defendant by the municipal authorities with instructions to cut off the current, could there be any doubt as to the liability of the defendant? Surely it was not necessary to endanger the property and lives of the plaintiff, his family and others for a few days in order to accommodate the convenience of the plaintiff, or his landlord. Recognition of the necessity for immediate action is found in the rules and reg-

ulations authorizing the discontinuance of the service without notice where the situation is dangerous.

Our attention is called to certain testimony showing that the repairs could have been made to plaintiff's home in the course of two or three hours, but, as previously pointed out, defendant cannot be penalized for the lack of diligence on the part of plaintiff's landlord in having the work promptly done.

It is further suggested that the defendant made no inspection of the premises but if, as we have concluded, the situation was a dangerous one and made known to the defendant, it is immaterial whether such knowledge was gained from the defendant's own inspection or one made by others.

Not only was the defendant authorized to discontinue the service under the foregoing rules and regulations, but was justified in doing so under the instruction of the Electrical Inspector. An ordinance of the City of Florence provided in part:

"Whenever, in the judgment of said Electrical Inspector, any electric wire or other apparatus shall be defective, by reason of improper or insufficient insulation or for any other cause, it shall be his duty to deliver immediately to the owner, lessee or person in charge of such electrical equipment, a written notice specifying the defects of such equipment and requiring the said owner, lessee or other person to remedy such defects within a certain time, to be stated in said notice; and the said Electrical Inspector may, in his discretion, order the immediate removal or repair of any defective apparatus or equipment which, in his opinion, is so dangerous as to demand immediate attention."

The failure to remedy the defect in such electrical wiring or apparatus, within the time specified in said notice, is by said ordinance made a criminal offense, subjecting the offender to punishment by fine or imprisonment.

This ordinance was enacted in the exercise of the police power for the safety of the public. It gives the Electrical Inspector the right to order the removal

of any defective electrical equipment which he deems so dangerous as to demand immediate attention. He so concluded in the instant case and directed an immediate discontinuance of the service. But it is said that no order to remedy the defect was given to the plaintiff and that this ordinance does not give the Electrical Inspector himself the authority to cut off the current or to direct others to do so. It is argued that if notice of a dangerous situation is given to the person in charge of such electrical equipment and he fails to remedy the defects, all that can be done is to invoke the criminal processes of the courts to enforce compliance. We think the proposed construction is a strained and unreasonable one whether the ordinance be given a strict construction as contended for by plaintiff, or a liberal construction as suggested by defendant. Under the plaintiff's view, where the Inspector finds electrical equipment in a dangerous condition, he is powerless to promptly correct it if the person in charge fails to heed his order, and the property and lives of the public must be left in danger while the offender is being prosecuted.

Having concluded that the defendant was justified in disconnecting the current, we shall now consider whether it was authorized to remove the meter. This meter was furnished by the defendant, as it was required to do under the Service Regulations. Plaintiff had no property interest therein. The cash deposit of $3.00 made by him when he applied for service was not a payment on the meter or for rental of this instrument, but to secure the payment of his electrical bills and as security against damage to defendant's property. Under Rule 11(c) of the Service Regulations, the defendant was given the right of ingress and egress to the premises of the customer at all reasonable hours "for the purpose of reading meters, inspecting Company's wiring and apparatus, changing, exchanging, or repairing its property on the premises of Customer and to remove such property at the time of or at any time after suspension of service or termination of Agreement." This regulation clearly authorized the defendant to enter upon

the premises for the purpose of removing the meter when service was suspended.

For the foregoing reasons, we find no breach of duty on the part of the defendant. Its motion for a directed verdict should have been granted. This conclusion makes it unnecessary to pass upon the other questions raised by the exceptions.

It is proper to state that we have not overlooked defendant's request that we consider Section 24-69 of the 1952 Code and determine its applicability to the facts of this case. This we decline to do because this code section was not presented to or considered by the court below. It is, therefore, not properly before us. *Hiers v. South Carolina Power Co.*, 198 S. C. 280, 17 S. E. (2d) 698.

Reversed and case remanded for entry of judgment in favor of the defendant under Rule 27.

STUKES, TAYLOR and LEGGE, JJ., and G. BADGER BAKER, Acting Associate Justice, concur.