186 So. 173

**HAMPTON v. BRACKIN'S JEWELRY & OPTICAL CO., Inc.**

**6 Div. 265.**

Supreme Court of Alabama.

Jan. 12, 1939.

Rehearing Denied Feb. 9, 1939.

Hugh A. Locke and Frank M. James, both of Birmingham, for appellant.

London & Yancey and Fred G. Koenig, Sr., all of Birmingham, for appellee.

KNIGHT, Justice.

Suit by plaintiff, appellant here, for damages sustained by her from the loss of one of her eyes, and the impairment of the vision of the other, due as the proximate result of the alleged negligence of the defendant, its agents or servants, in rendering optometrical service for plaintiff.

As originally filed, the complaint consisted of two counts, but thereafter two additional counts were added. Demurrer was sustained to count 2, and the case went to the jury on counts 1, 3 and 4.

Along with the Brackin's Jewelry & Optical Company, Inc., the plaintiff made P. H. Tyler, the Company's Optometrist, a co-defendant, but, before the case was given to the jury, the individual defendant was stricken, thus leaving the corporation as the sole defendant.

In count 1 the plaintiff claimed that her injuries were proximately caused by the negligent and unskillful conduct of defendant's optometrist "in and about rendering the optometrical service," which, it is alleged, the defendant had undertaken for a reward to perform for plaintiff.

Count 3 proceeds upon the theory that the plaintiff was suffering from a disease of the eye, which could not be remedied by the application of glasses, or mechanical treatment, but which could have been remedied or cured by medical treatment, but that nevertheless the defendant's optometrist, after an examination of plaintiff's eyes, fitted plaintiff with glasses, and represented to her that the glasses would cure the trouble. That by defendant's action and representation, the plaintiff was prevented from securing treatment by a doctor or specialist, and that by reason of the delay in securing medical treatment plaintiff lost the sight of one of her eyes, which could have been saved by a specialist, and deterioration of the sight of the other eye could have been stopped.

The fourth count proceeds upon practically the same theory.

There was no averment, in any of the counts, of a failure on the part of the defendant to exercise reasonable care and diligence in the selection of its optometrist.

The attorney for the appellant in his brief, under the caption of "Statement of Facts," has undertaken to set out the evidence so far as necessary to properly present for review the errors and exceptions relied on by appellant for a reversal of this cause. We here excerpt same.

"The plaintiff, Priscilla Hampton, went to the defendant's place of business in Birmingham, Jefferson County, Alabama, Brackin's Jewelry & Optical Company, Inc., a corporation, on or about the 17th day of May, 1935, for the purpose of having an examination made to determine whether or not she needed glasses (Tr. p. 42). Prior to this date the plaintiff had

been suffering with an ailment of her eyes. They would hurt her when she tried to sew or read. She saw the defendant's ad in a Birmingham newspaper, to the effect that it had an optometrist and was open to optometrical patients. She made the trip to defendant's place of business, as mentioned above. On or about the 17th day of May, 1935, when she was in defendant's place of business, she talked with Dr. P. H. Tyler, who was the defendant's optometrist and waited on its optometrical patients. He examined her eyes and prescribed glasses for the cure of her ailment. Plaintiff then agreed to pay seventeen dollars and fifty cents for the services and glasses, with the amount of three dollars being paid down and a payment each week thereafter. (Tr. p. 43). She was given a little brown receipt book, which was to be presented to the defendant each time she made a payment in order that the payment might be marked in the book. Through some error this book as an exhibit has been lost and cannot be found. Its contents are therefore not set forth in the record. However, its existence does not have a bearing upon appellant's contention in this case.

"About three days after the first visit plaintiff went back to the defendant's place of business to receive her glasses (Tr. p. 43). After receiving the glasses she attempted to wear them but they seemed to hurt her eyes. About a week later she went back to defendant's place of business to have Dr. Tyler check over the glasses and her eyes. According to her statement Dr. Tyler informed her that the glasses would remedy her ailment when she became used to wearing them. Plaintiff continued to wear the glasses, but from time to time between May 17, 1935 and November 2, 1935, she went back to defendant's place of business and had her eyes and glasses checked. According to plaintiff's statement each time she went back to defendant's place of business, she talked with Dr. Tyler, and each time he insisted upon her continuing to wear the glasses. These facts are disputed by Dr. Tyler.

"On November 2, 1935, plaintiff went back to defendant's place of business and again talked with Dr. Tyler and complained to him that she could not see out of one of her eyes. On this occasion Dr. Tyler made an examination and discovered that the sight of her right eye was completely gone, and advised her at this time to see a physician. She then saw a physician and was informed that she was suffering from glaucoma which had caused a detached retina of her right eye and was at that time affecting her left eye. Subsequent thereto plaintiff had to undergo an operation to have her right eye removed, and her left eye treated in order to save it."

The evidence showed, without conflict, that the said P. H. Tyler was a duly licensed optometrist, of many years' experience, and there was no evidence in the case showing, or tending to show, a failure on the part of the defendant to exercise reasonable care and diligence in the selection of its optometrist.

The court, at the instance of the defendant, gave a number of written charges, which the appellant insists were erroneous. However, the court refused the general charge requested by the defendant as to each of the three counts separately.

There were verdict and judgment for the defendant. From the judgment the present appeal is prosecuted by the plaintiff.

It is apparent that the case, after the defendant's demurrers had been overruled, was tried upon the theory that the relationship of master and servant existed between the appellant and its optometrist, P. H. Tyler, and, therefore, that the doctrine of respondeat superior applied.

A proper solution of the question involved on this appeal requires a determination of whether the relationship of master and servant did in fact and law exist between the said P. H. Tyler and Brackin's Jewelry & Optical Company, Inc., at the time the plaintiff had the said Tyler to examine her eyes and fit her with glasses. If no such relationship existed, then of course the doctrine of respondeat superior would not apply in the case.

In 1919, the Legislature of Alabama, following similar legislation in other states, undertook to legislate upon the subject of optometry, and to define optometry, to regulate the practice, and to prescribe qualifications for those who would engage in the practice; to provide for the examination of applicants by a Board of Optometry to be appointed by the Governor; and to punish violations of the provisions of the Act.

Section 1 of the Act, Laws 1919, p. 742, now Section 2873 of the Code, provides:

"The practice of optometry is defined to be the examination of the human eye for the purpose of ascertaining any departure from the normal, measuring its functional powers and adopting mechanical means for the aid thereof."

Section 3 of the Act, now Section 2875 of the Code, provides for the appointment of a Board of Optometry.

Section 9 of the Act, now Section 2880 of the Code, provides, inter alia: "Every person desiring to commence the practice of optometry in this state, except as otherwise provided, shall take the standard examination provided in this article, and fulfill the other requirements as herein provided. * * * Such standard examination shall consist of tests in practical, theoretical and physiological optics, in theoretical and practical optometry and in the anatomy and physiology of the eye and in pathology as applied to optometry. Such standard examination shall not be out of keeping with the established teachings and adopted text books of recognized schools of optometry."

Section 14 of said Act, now Section 2885 of the Code, provides for the issuance of license to such applicants as shall pass the standard examination, etc.

Section 2890 of the Code provides: "Nothing in this article shall be construed as authorizing any optometrist to administer drugs in any form, to practice or claim to practice, medicine, or surgery in any sense, or to use any title or appellation intended or calculated to indicate the practice of medicine or surgery."

The statute also provides for the suspension or revoking of an optometrist's license for certain enumerated causes, among them, unprofessional conduct and gross incompetency.

Section 2893 of the Code provides: "Nothing in this article shall be so construed as to prevent any person, firm, or corporation from owning or operating a store or business establishment wherein eyes are examined or glasses fitted; provided, that such store, establishment, or optometric department shall be in charge of a duly licensed optometrist, whose name must appear on and in all optometry advertising of whatsoever nature done by said person, firm or corporation."

It is of course this provision of the law that authorized or permitted the corporation defendant to own and operate a store or business establishment, wherein the human eye might be examined and glasses fitted. But this permission was to be operative only when such "store, establishment, or optometric department shall be in charge of a duly licensed optometrist, whose name must appear on and in all optometry advertising of whatsoever nature done by said person, firm or corporation."

It cannot be doubted for a moment that the practice of optometry bears a direct and substantial relation to the public health, and that it calls for special skill and knowledge on the part of those practicing it. It was for this reason, no doubt, that the Legislature undertook to legislate upon the subject, that the public might be protected from fakers and incompetents. We know from common experience that there are many distressing troubles which are attributable to defective eyesight, and which may be cured, or relieved by properly fitted glasses.

As pointed out in the case of Price v. State, 168 Wis. 603, 171 N.W. 77, 79, "To properly diagnose and prescribe for the particular defect from which the patient is suffering requires a knowledge of the anatomy of the eye as well as the subject of physical optics, being that branch of the general subject of physics which deals with the action or effect of lenses on light, and how light is directed, reflected, and refracted."

The Legislature recognized the fact that no one, without the requisite skill and knowledge, should be allowed to practice optometry, and hence by Section 2880 of the Code a standard examination is required, which shall consist of tests in practical, theoretical and physiological optics, in theoretical and practical optometry, and in the anatomy and physiology of the eye and in pathology as applied to optometry.

Thus it would appear that the Legislature has seen proper to recognize and regard optometry as a profession, one requiring knowledge of the functioning of the eye, its anatomy, and of pathology as applied to optometry.

When the optometrist undertakes to make an examination of the eyes, with a view of determining whether glasses will be of aid to his patient, he must, of course, bring to bear, in making such examination, his professional, or scientific skill, and knowledge, and he cannot be directed by

his employer, who has no such knowledge. He acts, and must act, in such matters, as his skill and knowledge and independent judgment suggest is the proper course to be pursued.

But does this mean that the employer, whose business the optometrist is conducting is not answerable for the negligence of the optometrist resulting in injury and damage to a third person, who has gone to the employer's place of business for an examination of her eyes and to be fitted with glasses? It was the defendant's business, under the control of its optometrist, to be sure, but the employer undertook for a pecuniary reward to render competent and proper service. From his business the employer derives a direct benefit. For all practical purposes, the employer was engaged in rendering optometrical service to the public. The case stands as though the employer was the optometrist.

■ The doctrine of liability of the master for the wrongful acts of his servants is rested upon the maxims respondeat superior and qui facit per alium facit per se. In fact, it rests upon the doctrine of agency. Hardeman v. Williams, 150 Ala. 415, 43 So. 726, 10 L.R.A.,N.S., 653.

■ " 'The maxim of respondeat superior,' says Lord Chief Justice Best in Hall v. Smith (2 Bing. 156, 160, 9 E.C.L. 357), 'is bottomed on this principle: That he who expects to derive advantage from an act which is done by another for him must answer for any injury which a third person may sustain from it.' " 18 R.C.L. p. 787, Sec. 247; Fetting v. Winch, 54 Or. 600, 104 P. 722, 38 L.R.A.,N.S., 379, 21 Ann.Cas. 352; Barker v. Chicago, P. & St. L. R. Co., 243 Ill. 482, 90 N.E. 1057, 26 L.R.A.,N.S., 1058, 134 Am.St.Rep. 382.

■ There are duties often imposed upon an employer which he cannot delegate to another. Such duties are either imposed by law, or by the contract between the parties. Where such duties are imposed, whether by law or contract, he is liable for their negligent or non-performance, though he employs an independent contractor to do the actual work. Alabama Power Co. v. Pierre et al., Ala.Sup., 183 So. 665;[1] Dixie Stage Lines v. Anderson, 222 Ala. 673, 134 So. 23; Alabama Power Co. v. Emens, 228 Ala. 466, 153 So. 729.

■ Here the defendant was engaged in operating an optometrical business. His alter ego was the optometrist. The defendant was paid for the services of his optometrist. The defendant cannot, therefore, escape liability because of the independent character of the agent's or servant's business. The defendant was bound to see that those who sought examination of their eyes and the fitting of glasses received proper attention and service, and for any injury or damage to defendant's patients, proximately caused by the want of skill or negligence of the optometrist, it, defendant, would be liable. Labatt's Master & Servant, 2d Ed., Vol. 5, p. 6214; Richardson v. Carbon Hill Coal Co., 6 Wash. 52, 32 P. 1012, 20 L.R.A. 338.

In the last cited case of Richardson v. Carbon Hill Coal Co., supra, it was observed [page 1013]: "If * * * the company was conducting a hospital with its own physician for the purpose of deriving profit therefrom, or if it contracted with the appellant to furnish him with the services of a competent physician, and to properly treat him in case of an injury, it would be liable for the negligence or want of skill of its physician in attending him."

In the case of Phillips v. St. Louis & S. F. R. Co., 211 Mo. 419, 111 S.W. 109, 17 L.R.A.,N.S., 1167, 124 Am.St.Rep. 786, 14 Ann.Cas. 742, the Supreme Court of Missouri held that a hospital, managed by an association, which was, to all intents and purposes, a department of the defendant railway company, was not a charitable institution, and further held that the company did not discharge its liability by merely employing competent doctors. That the company must go further, and treat in a proper manner the patients received. That the railroad company occupied the position of ordinary physicians; and being subject to the same obligations as the physicians. It was further held, in that case, that the association operating the hospital, although having a separate corporate charter, was the railroad itself, its alter ego, and if it undertook to furnish treatment, not as a charity, it stood in no different light from ordinary physicians.

We conclude, therefore, that P. H. Tyler was the Brackin's Jewelry & Optical Company, Inc., its alter ego, answerable for

---

any and all actionable negligence of the said P. H. Tyler.

Our case of Parsons v. Yolande Coal & Coke Co., 206 Ala. 642, 91 So. 493, is not, under the facts of that case, opposed to the conclusion in the instant case. In the Parsons Case the defendant was engaged in the coal mining business and not in the business of ministering to the sick or disabled for profit. At most, in furnishing medical treatment to its employees, it did so as a mere incident to its business. But here the defendant was engaged primarily in the business of furnishing optometrical service to the public for a reward.

This, then, brings us to the consideration of the meaning of optometry, and the scope of the duties of one engaged in the practice of this profession.

■ Apart from the statutory definition of optometry, it is defined as, "The employment of any means, other than the use of drugs, for the measurement of the power of vision and the adaptation of lenses for the aid thereof; the employment of subjective and objective mechanical means to determine the accommodative and refractive states of the eye and the scope of its functions in general; measurements of the powers of vision in general, as acuteness of perception of form and color or the extent of the field; more narrowly, the measurement of the range of vision." 46 C.J. p. 1124.

We excerpt the following from the New International Encyclopaedia (2nd Ed.):

"Optometry (from Gk. * * * * optos, visible plus * * * *, metron, measure; literally, eye measuring). The science of measuring the accommodative and refractive powers of the eye without the use of drugs. It is defined in various statutory laws regulating the practice as 'the employment of any means, other than the use of drugs, for the measurement of the powers of the human vision and the adaptation of lenses for the aid thereof.' The practitioner of this art is called an optometrist. Optometry is a branch of ophthalmology, and the usual methods employed by physicians in making visual tests are used, viz., test cards having graduated letters or symbols, the trial case of assorted lenses, the ophthalmometer, ophthalmoscope, skiascope, phorometer, etc. The ophthalmoscope and ophthalmometer are described under these titles. The skias-

cope, or retinoscope, is a small circular mirror, plane or slightly concave, which reflects a beam of light into the pupil of the eye. Slight horizontal or vertical movements of the instrument produce a shadow which travels across the pupil in the same or in an opposite direction to the movement of the skiascope, according to the state of the refraction. The examiner looks through a small circular opening in the centre of the mirror. Trial lenses are now placed before the eye until one is found which neutralizes or reverses the direction in which the shadow moves. This lens indicates the refractive condition at a particular meridian and enables the examiner to ascertain the amount not only of corneal but also of lenticular astigmatism. The phorometer is an instrument consisting essentially of prisms mounted in a frame, by which the strength and balance of the external muscles of the eye may be determined.

"Under the stimulus of legislation optometry as a science has rapidly developed, and improved instruments for the examination of the eye, as well as many advances in the adaptation of lenses to correct visual errors, have been introduced. Students are now thoroughly grounded in the science of optics as a preliminary to the examination of the eye. While no attempt is made to teach diagnosis and treatment of eye diseases, and while dilation of the pupil with drugs is forbidden by law, the student is taught to distinguish between mere refractive errors and pathological conditions of the ocular tissues. All the processes connected with the manufacture of lenses are also studied." [New International Encyclopaedia (2nd Ed.), Vol. 17, p. 495].

Thus we see that the duties of the optometrist do not require, or even authorize, diagnosis and treatment of eye diseases.

We further see that the statute, Section 2890, in legal effect, prohibits any optometrist from administering drugs in any form, to practice, or claim to practice, medicine, or surgery in any sense, or to use any title or appellation intended or calculated to indicate the practice of medicine or surgery.

■ Clearly, then, the duty resting upon the optometrist was to make examination of the plaintiff's eyes for the "purpose of ascertaining any departure from normal (having reference to vision), measuring

its functional powers, and adapting mechanical means for the aid thereof." If, however, in the performance of those duties, it would be apparent to a skillful optometrist that there existed in the eye under examination a disease or malformation, we would not say that it would not be his duty to so advise his patient, so that proper medical or surgical treatment might be had.

On the undisputed evidence in this case, it is apparent that the disease of plaintiff's eyes was not such as that it should have been detected by a skillful optometrist in the performance of the duties pertaining to his profession, and that he did not discover such a condition to exist. And, therefore, he did not breach a possible duty in that connection.

On the undisputed evidence, under the law of the case, the defendant was entitled to the general affirmative charge, as to each count of the complaint. Such charges were duly requested by the defendant.

Therefore, if it can be said that any one of the special charges, given at the instance of the defendant, was bad, the error was without injury.

Likewise we do not think there was any reversible error in sustaining defendant's objection to the question propounded by plaintiff to Dr. Locke. This question called for irrelevant and immaterial testimony.

Finding no reversible error in the record, the judgment of the circuit court must be affirmed. It is so ordered.

Affirmed.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.

