261 So.2d 17

### LEE OPTICAL COMPANY OF ALABAMA, Inc., a Corp.

v.

### STATE BOARD OF OPTOMETRY.

3 Div. 488.

Supreme Court of Alabama.

March 30, 1972.

Rehearing Denied April 27, 1972.

, Hill, Hill, Stovall, Carter & Franco, and Harry Cole, Montgomery, Douglas E. Bergman, Dallas, Tex., for appellant.

**340**

Thomas F. Parker, Montgomery, Alton L. Turner, Luverne, Joseph G. L. Marston, III and Donald George Valeska, II, Asst. Attys. Gen., Richard A. Billups, Jr., Jackson, Miss., for appellee.

HARWOOD, Justice.

The Alabama Board of Optometry (hereinafter referred to as the Board) filed a bill against Lee Optical Company of Alabama (hereinafter referred to as Lee). Originally thirteen optometrists and one physician were also named as co-respondents along with Lee, but these individual respondents were eliminated on order of the court.

The bill sought to enjoin Lee "from the unlawful practice of optometry, either directly or indirectly in the State of Alabama," and from employing by any means or arrangement registered (i. e., licensed) optometrists or physicians, surgeons, or oculists to examine the eyes of Lee's customers and prescribe eyeglasses for Lee's stores in Alabama.

At this point it would not be amiss to point out that our statutes pertaining to optometry, originally passed in 1919, are to be found in Chapter 11, Title 46, Code of Alabama 1940, Sections 190–213 inclusive, and hereinafter all references to code sections will be deemed to be those in Chapter 11, Title 46. The original provision of the

optometry law remained without material change until 1965.

Prior to its repeal in 1965, Section 210 read as follows:

"Nothing in this chapter shall be so construed as to prevent any person, firm, or corporation from owning or operating a store or business establishment wherein eyes are examined or glasses fitted; provided, that such store, establishment, or optometric department shall be in charge of a duly licensed optometrist, whose name must appear on and in all optometry advertising of whatsoever nature done by said person, firm or corporation." Until amended in 1965, Section 211 provided:

"It shall be unlawful for any person, firm or corporation, engaged in the practice of optometry in this state, to print or cause to be printed, or circulate or cause to be circulated, or publish, by any means whatsoever, any advertisement or circular in which appears any untruthful, impossible, or improbable or misleading statement or statements, or anything calculated or intended to mislead or deceive the public. And it shall be unlawful for any individual, firm or corporation, engaged in the sale of goods, wares or merchandise who maintains or operates, or who allows to be maintained and operated in connection with said mercantile business an optometry department; or who rents or subleases to any person or persons for the purpose of engaging in the practice of optometry therein, any portion of or space in said store, premises or establishment in which such person, firm or corporation is engaged in said mercantile business, to publish, or circulate, or print or cause to be printed, by any means whatsoever, any advertisement or notice of the optometry department maintained, operated, or conducted in said establishment or place of business, in which said advertisement or notice appear any untruthful, improbable, impossible, or misleading statement or

statements, or anything calculated to mislead or deceive the public."

By Act No. 218, approved 4 August 1965, 1965 Acts of Alabama, p. 304, Section 210 was repealed in its entirety, and Section 211 was amended to read:

"It shall be unlawful for any person engaged in the practice of optometry in this state to print or cause to be printed, or circulate or cause to be circulated, or published, by any means whatever, any advertisement or circular in which appears any untruthful, impossible, or improbable or misleading statement or statements, or anything calculated or intended to mislead or deceive the public."

The crucial question presented in the court below was whether Lee, in view of the statutory changes above mentioned was directly or indirectly practicing optometry by having in its optical stores registered optometrists whether as an employee of the store, or as an occupier of space in the store.

The undisputed evidence shows that for some time prior to the statutory changes above mentioned, Lee employed a registered optometrist in its optical stores. He was employed on a salary basis for the purpose of examining the eyes of prospective customers who came into the store to buy eyeglasses, but who did not have a prescription. No charge was made for the eye examination except in those cases where the examination indicated the customer did not need glasses. In this event a charge of $5.00 was made for the examination, such payments going to Lee. The optometrist under such employment received certain fringe benefits such as participation in a pension and profit sharing plan, hospital and life insurance programs, etc.

The contract could be terminated at any time by either party.

After the repeal of Section 210, and the amending of Section 211, the Secretary of the Board wrote to every registered optom-

etrist, including those employed by Lee, calling attention to the changes in the optometry statute.

It appears, however, that Lee continued its original method of employment of optometrists in its stores until 1 April 1970, some four or five years after the filing of the complaint in the present suit.

On 1 April 1970, Lee notified all the optometrists employed by it that the original contract of employment was being cancelled.

In lieu of the original contract a new contract was entered into between Lee and the formerly employed optometrists.

Under this new agreement Lee agreed to furnish to the optometrist sufficient space in its store, together with adequate ophthalmic equipment necessary for the optometrist to carry on his practice. The optometrist agreed to conduct his practice in a skilled manner in accordance with all applicable laws, and maintain a proper doctor-patient relationship with his patients.

The optometrist agreed to maintain all necessary patient records, and to separately charge his patients for eye examinations. Lee agreed to collect such examination fees, to keep records in connection therewith, and to remit such fees to the optometrist semi-monthly.

The optometrist agreed to maintain during the term of the agreement sufficient malpractice and liability insurance to protect Lee from any liability resulting from the optometrist's practice on Lee's premises, and to hold Lee harmless from any such claim.

It was stipulated in the agreement that it was in no way to be construed as an employment contract, and that neither party should have any right of control over the respective operations of the other.

It was further provided that the agreement could be terminated by either party upon ten days' notice in writing to the other.

Optometrist witnesses presented by Lee who had worked for Lee under the first arrangement and who continued their practice in Lee's stores after the second agreement, testified that the only material changes in the work of the optometrists before and after the change in the agreement between Lee and the optometrists was that after the change the optometrists received no salary or fringe benefits from Lee, and they themselves fixed and received the fees for eye examinations performed by them. Further, after the change in the agreement no time was fixed for their presence in the stores.

In the hearing below, the Board presented a number of witnesses who, at the request of members of the Board, or at the request of members of the Alabama Optometric Association, had gone into Lee stores for the purpose of eye examinations and to purchase glasses.

Two of these witnesses were students in an optometry school in Memphis, and the others were either relatives or employees or acquaintances of optometrists practicing individually.

Their testimony concerned chiefly the time taken in making the examinations. This time was stated to be from three minutes to ten minutes.

For instance, Miss Linda Daves testified that at the request of her friend Linda Stauter, a former employee of an optometrist practicing individually in Mobile, she had on 27 August 1970, gone to two Lee stores in the Mobile area for the purpose of buying glasses. The optometrist had given her $30.00 with which to purchase the glasses.

In one Lee store she had her eyes examined by Dr. Pillion. First, the receptionist filled out a form showing her name, age, address, etc., and the nature of her complaint, which she stated to be headaches.

She then saw Dr. Pillion. According to Miss Daves his examination lasted three minutes. She then proceeded to select frames for the prescribed glasses. She had been instructed to note the time of the examination and the length of time she was in the store. This she did with her watch. She was in the store altogether eight minutes, which included the time used by Dr. Pillion in examining her eyes, the selection by her of the frames, etc. She paid $20.80 to Lee. After the visit to the first Lee store she went back to the individual optometrist's office and returned the $9.20. She was then given another $30.00 for the visit to the second Lee store. Again the charge was $20.80, and again she returned the balance of the $30.00 after the payment to Lee of $20.80.

In rebuttal Dr. Pillion testified that he did not have an independent recollection of his examination of Miss Daves, but he had a record of his examination made of her eyes on 27 August 1970. He always inquired of a patient as to his or her medical history, and the type of trouble the patient was having with his or her eyes. Miss Daves had indicated she was having headaches. From the data on his record showing the type of examination he had made of Miss Daves' eyes, it would have been impossible for him to have made such examination in three minutes.

Dr. Pillion further testified that the time necessary for an eye examination depends upon the cooperation of the patient and his ability to respond to questions during the examination, and the conditions disclosed. An examination of a patient with minimum difficulty would require from ten to twenty minutes.

If a patient requested a copy of a prescription for glasses he would be given the prescription and the patient would be free to buy glasses from any optician. Ordinarily, however, a patient did not request a copy of a prescription, and after writing the prescription, he would hand it to the receptionist in the Lee store who would then attend to the selection of the frames by the patient and the processing of the procurement of the completed eyeglasses.

A number of optometrists who practiced individually, several of whom were members of the Board, testified without exception that they sold eyeglasses to patients after examining their eyes and determining the prescription for eyeglasses. Unless a patient asked for a copy of the prescription it was not given. If glasses were sold a patient, their fees ranged from $30.00 up for single vision glasses. This included the fee for the eye examination. If glasses were not purchased, their fee for the examination ranged from $12.00 to $30.00 depending upon the nature of the examination.

After completion of the hearing below the Chancellor entered a decree in which he made extensive findings. He decreed that Lee be enjoined from:

1. Engaging in the practice of the profession of optometry, either directly or indirectly, and from employing, by any means, directly or indirectly, licensed optometrists or physicians to examine the eyes of its customers.

2. Keeping optometrists, whether by contract of employment, or by lease agreement or device, in its places of business in Alabama.

3. Showing on its store front or in its advertisements the name of any optometrist or physician, or from using in such displays any such phrases as "eyes examined", "your scientific eye examination", "glasses fitted", or from using any such phrases that would indicate to the public that Lee is qualified to examine the eyes of its customers or to fit eyeglasses for them in connection with the sale of eyeglasses.

4. From making any arrangement with any optometrist or physician whereby it would refer its customers to such optometrist or physician, or whereby such optometrist or physician would re-

fer their patients to Lee, for the specific purpose of promoting the sale of Lee's eyeglasses, regardless of where such optometrist or physician is located.

5. From making any referrals of customers to any specific eye specialist, or indicating the possible convenience of a nearby eye specialist.

As before stated, our statutory law relating to optometrists and the practice of optometry is to be found in Title 46, Chapter II, Sections 190–213 of our code, as amended.

■■ As to the purpose of the legislature in repealing Section 210, and amending Section 211, we can only determine what such purpose was by what the legislature did or said. Holt v. Long, 234 Ala. 369, 174 So. 759; Ex parte Wilson, 269 Ala. 263, 112 So.2d 443. Further, while a literal construction of a statute is not to be permitted to defeat the spirit of a legislative act, nevertheless where an act pertains to a whole subject the act in all its parts must be considered, and not merely an isolated section. Ex parte Wilson, supra.

Prior to the decretal portion of his decree the Chancellor set forth:

"The court holds that the action of the Alabama Legislature in repealing Section 210 and amending Section 211, terminated the right that Lee had to conduct an optical dispensing business with the aid and assistance of an optometrist employee. There is no longer in Alabama statutory authority for a person, firm or corporation to operate a business wherein eyes are examined and glasses fitted even with a licensed optometrist on the premises, and the court holds it is unlawful for Lee to do so or to advertise to the effect that it is qualified to do so."

Alabama State Board of Optometry v. Busch Jewelry Co., 261 Ala. 479, 75 So.2d 121, pertained to the revocation of the license of an optometrist for advertising, contrary to the canons of the Alabama Optometric Association. As to the legislative policy embraced in Section 210 prior to its repeal, this court declared such policy to be to permit, first, "the operation of an optometric department as part of a general merchandising business, provided such department is 'in charge of a duly licensed optometrist,'" and second, "the advertising of such department, provided the name of the licensed optometrist is used in the advertising." Therefore, the naming of the optometrist in advertising by a corporation was compulsory under the then existing Section 210, which this court held superseded any rule or canon of the Alabama Optometric Association prohibiting advertising by an optometrist.

Whether the repeal of Section 210 would now place optometrists within the advertising ban of the Alabama Optometric Association as amended which as set forth in *Busch Jewelry Company*, supra, prohibits advertising by optometrists except for new licensees or members who change their location when a discreet professional card may be run for a reasonable time not to exceed ninety days, is not before us. This for the reason that this proceeding is not for the purpose of revoking the license of an optometrist.

■ We cannot see that the mere repeal of Section 210, and the amending of Section 211, "terminated the right that Lee had to conduct an optical dispensary business with the aid and assistance of an optometrist employee" as ruled by the Chancellor.

This, we think must depend upon legislative policy reflected by all our statutes pertaining to optometry, and also whether optometry is to be classified as a learned profession.

In Sales-Davis Co. v. Henderson-Boyd Lbr. Co., 193 Ala. 166, 69 So. 527, it was stated:

"The courts have gradually enlarged the implied powers of ordinary corpora-

tions, until such corporations may do almost anything that an individual may do, provided the state and the stockholders and creditors do not object."

Clearly, there was no objection from the stockholders or creditors in this case to Lee permitting optometrists to practice in its stores. Nor can we find any objection evidenced in our optometry statute.

The occupation of optometry was one of common right, and was unregulated by the state until 1919.

■ Where statutes regulating callings of common right are passed under the police power of a state, the right to such calling remains except as limited by the provisions of the regulating statute. State ex rel. Attorney General v. Gus Blass Co., 193 Ark. 1159, 105 S.W.2d 853.

It would appear therefore that the only effect of the repeal of Section 210 (and the amendment of Section 211) is to take away the statutory authority of a corporation or firm to advertise the name of any optometrist employed by such person, firm or corporation.

In this connection we note that Section 206, Title 46, Code of Alabama 1940, relating to the revocation or suspension of the license of an optometrist, lists as one of the grounds of revocation, " * * * or the doing or performing of any acts in his profession declared by the Alabama Optometric Association to be unethical or contrary to good practice."

The decisions relating to whether employing a licensed optometrist constitutes practicing optometry by the unlicensed employer, usually an optical dispenser, are legion, and most often of considerable length. Authority may be found for most any view. We would further compound our reluctant affront to desired brevity should we attempt to quote from, analyze, and cite all such cases in this necessarily overlong opinion. The discordance to be found in the varied conclusions reached springs from the variety of the controlling statutes. Many of these decisions are collected and commented upon in an annotation to be found in 88 ALR2d 1293, Section 3.

Many states have statutes to the effect that it is unlawful for any licensed optometrist to practice his profession in any mercantile establishment; or to engage in the practice of optometry with any organization, group, or lay individual; or to accept employment from any company or corporation; or to practice optometry on premises not separate from premises where eyeglasses are sold. See Gen.Stats. of Connecticut, Chap. 380, Section 20–133(a); Florida Stats., Title 30, Section 463.11, F.S.A.; Maine Rev.Statutes, Title 32, Section 2452; Annotated Laws of Massachusetts, Chapter 112, Section 73B; Rev.Code of Montana (1947), Title 66, Section 66–1312; New Hampshire Rev.Statutes, Chapter 327, Section 27; Oklahoma Statutes, Title 59, Section 585(c); South Carolina Code of Laws, Title 56, Section 1077(5); Tenn. Code, Anno., Title 63, Section 815; West Virginia Code, (1966), Chap. 30, Art. 8, Section 10.

On the other hand some states have by statute apparently expressly authorized licensed optometrists to practice as employees of unlicensed persons, firms, or corporations. See Colo.Rev.Stats., Section 102–1–5(1) (a–b); Illinois Rev.Stats., Chapter 91, Section 105.4; Virginia Code, Title 54, Section 54–388(j).

The Alabama Legislature has no statute expressing a policy either way on this question. However, a policy can be deduced from the provisions of Section 206 setting forth that one of the grounds for revocation of an optometric license is, " * * * employing directly or indirectly any suspended or unlicensed optometrist to do any optometrical work."

■ While such provision could apply only to a licensed optometrist employing an

unlicensed optometrist, yet the implication is that an optometrist may accept employment from others.

The deposition of Thomas S. Gibson was received in evidence at the behest of the respondent. Dr. Gibson has practiced optometry in Huntsville, Alabama, for thirty years, and was a former President of the Board, and Vice President of the Board at the time of the hearing below, as well as a former President and Vice President of the Alabama Optometric Association. Dr. Gibson testified that so far as he knew there is no rule promulgated by either the Board, or the Alabama Optometric Association which would prohibit an optometrist from practicing on premises either furnished to him, or leased to him, by a dispensing optician, nor as far as he knew is there anything which prohibits a dispensing optician from referring patients to a practicing optometrist. Neither was there anything wrong in an optometrist referring patients to a dispensing optician.

This court has held that the practice of optometry bears a substantial relation to public health, and that it calls for special skill and knowledge of those practicing it, and for this reason the legislature undertook to regulate optometry in order that incompetents and fakers could not impose upon the public. Hampton v. Brackin's Jewelry & Optical Co., 237 Ala. 212, 186 So. 173.

Our legislature has spoken and has prescribed limitations upon those who may practice optometry. Nowhere in our statutes are there any restrictions on licensed optometrists as to how, when, or for whom they may work. There is nothing forbidding his acceptance of employment at a salary, nor forbidding anyone from employing him, and nothing stating that such employment is unlawful, or against public policy.

The purpose of our optometry act is to license and regulate those who examine eyes and prescribe eyeglasses.

When that purpose is accomplished by a specific statutory provision, it is not within the province of the court to read into it something not designed to protect the public interest. Our statutes were designed to protect the public, and not to confer favors upon optometrists, or any special group of optometrists. Certainly, there is a social interest involved in this situation in affording the public an opportunity of procuring prescription eyeglasses at the least cost, provided incompetents are not permitted to examine eyes. Our licensing provisions were designed to see that only persons qualified to do so would perform this service.

In Golding v. Schubach Optical Co., 93 Utah 32, 70 P.2d 871, a case involving the same question as the one now being considered, and under almost identical statutory provisions, the Supreme Court of Utah wrote:

"The right of one to sell his time and his talents is the same, and as inalienable as the right of the owner of any other property to contract respecting the use, sale, or enjoyment thereof. This right of contract, of course, is subject to such reasonable police regulations as may be enacted to promote the public good."

Section 35 of our Constitution of 1901, declares:

"The sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression."

We find nothing in our statutes pertaining to optometry evidencing a legislative policy that an optometrist duly qualified and licensed under the laws of this state, may not be employed by another to examine eyes for the purpose of prescribing eyeglasses.

We are therefore not in accord with the Chancellor's ruling that the repeal of Section 210 and the amendment of Section 211

"terminated the right that Lee had to conduct an optical dispensary business with the aid and assistance of an optometrist employee."

To obtain a license to practice optometry in this state one must have completed certain specified educational requirements, including a course of study in an approved school or college of optometry which requires at least three years of study, and then must pass the standard examination prescribed by the Board. With this imprimatur of competency one is then granted a license to practice optometry.

We come now to consider whether the decree of the lower court should be upheld on the theory that the practice of optometry is the practice of a learned profession whose members are not permitted to hire themselves out to any third party who seeks to employ them and their talents for purposes of profiting from the resale of their services.

We gather from certain expressions in the Chancellor's decree that he considered optometry a learned profession. In addition to setting out in his decree a portion of the opinion of the Supreme Court of Mississippi in Sears, Roebuck & Co. v. State Board of Optometry, 213 Miss. 710, 57 So.2d 726, wherein it was stated: "The practice of optometry is undoubtedly one of the subdivisions of the practice of medicine * * *", the Chancellor further set forth that the repeal of Section 210 "was a recognition by the Alabama Legislature * * * that it was not in the best interest of Alabama citizens to maintain the statutory distinction between the practice of optometry and the other professions in the health field", and further that "an optometrist, like a dentist or a physician has a relationship with his patients that cannot be nurtured in the market place."

There are several callings in the health care field, or the healing arts field, which cannot be classified as learned professions such as medical technicians, regis-

tered nurses, practical nurses, pharmacists, chiropodists, and perhaps others.

As to optometrists, Section 207 provides:

"Nothing in this chapter shall be construed as authorizing any optometrist to administer drugs in any form, to practice or claim to practice medicine or surgery in any sense, or to use any title or appellation intended or calculated to indicate the practice of medicine or surgery."

These specific provisions expressing in clear terms the legislative policy necessitates the conclusion that a court would not be justified in concluding that optometry is "a subdivision of the practice of medicine" or that repeal of Section 210 was "a recognition by the Alabama Legislature that it was not in the best interest of the citizens of Alabama to maintain the statutory distinction between the practice of optometry and the other professions in the health care field." The practice of medicine is of course in the health care field. By leaving Section 207 untouched, the legislature specifically retained the distinction · between the practice of optometry and the practice of medicine. We would not be warranted in ignoring this clearly expressed legislative policy.

Nor do we consider that the relationship existing between an optometrist and patient rises to the degree of confidential relationship existing between doctor and patient or attorney and client. A person seeking the services of a physician or lawyer must reveal to such professional adviser the most intimate secrets of physical or mental disability, or of his business or conduct. As stated in Silver v. Lansburgh & Bro., 72 App.D.C. 77, 111 F.2d 518, such relationship by its very nature creates a relationship of trust and confidence, and the physician's or attorney's allegiance must be wholeheartedly to the patient or client, and not to another, and "nothing of this nature applies to the practice of optometry." Ordinarily information of no great intimacy is revealed by one seeking only an eye ex-

348

amination looking toward securing proper lenses for eyeglasses.

Section 190 defines optometry as follows:

"The practice of optometry is defined to be the examination of the human eye for the purpose of ascertaining any departure from the normal, measuring its functional powers and adopting mechanical means for the aid thereof."

In Silver v. Lansburgh & Bro. supra, the following is set forth:

"We have considered the cases, and are of opinion the best considered adopt the view that optometry is not 'one of the learned professions.'

"Optometry is said by a well known writer on the subject not to be a part of medicine, 'either by inheritance, basic principles, development or practice.' It is 'an applied arm of optical science resting upon the work and discoveries of physicists and opticians through the ages down to modern times. It does not treat the eye, whether in health or disease, but adapts the light waves which enter the eye, in accordance with optical principles so as to produce focused and single vision with the least abnormal exertion on the part of the eye.' Arrington's History of Optometry, p. 24 (1929)."

In Hampton v. Brackin's Jewelry & Optical Co., supra, this court elaborated on the definition of optometry. We find nothing therein departing from the basic definition of optometry as set forth in Section 207. After pointing out that the duties of an optometrist do not require, or even authorize, diagnosis and treatment of eye diseases, the court further observed that if in the performance of his duties it should be apparent to a skillful optometrist that a disease or malformation of the eye existed, "we would not say that it would not be his duty to so advise his patient, so that proper medical or surgical treatment might be had."

Many callings or vocations which, because they require special knowledge of a branch of science, or special skills and abilities, are designated as professions.

Such designation does not, however, constitute these callings into a learned profession. They are professional only in the broader meaning of the term. The legislature as well as this court has recognized optometry as a profession. See Hampton v. Brackin's Jewelry and Optical Co., supra. This does not mean, however, that by such recognition of optometry as a profession, it follows that optometry is thereby made a learned profession. Indeed, in State ex rel. Bricker v. Buhl Optical Co., 131 Ohio St. 217, 2 N.E.2d 601, the Supreme Court of Ohio, commenting upon a former Ohio case wherein it was held that optometry was a profession, stated it was not meant thereby to hold that optometry was a learned profession, but that it was a "limited statutory profession."

Through time the learned professions have been recognized as law, medicine, and the ministry, to which is sometimes added the profession of arms. This recognition has resulted from the inherent nature of the callings, and prior to, and not from any statutory enactments regulating their conduct. See Golding v. Schubach Optical Co., supra; Georgia State Board, etc. v. Friedmans' Jewelers, 183 Ga. 669, 189 S.E. 238; State v. Kindy Optical Co., 216 Iowa 1157, 248 N.W. 332; Dvorine v. Castleberg Jewelry Corp., 170 Md. 661, 185 A. 562; Mack v. Saars, 150 Conn. 290, 188 A.2d 863.

Our research discloses that four states have by statute specifically declared optometry to be a learned profession, namely Arkansas, Colorado, Georgia, and Nevada. See Arkansas Stats. Anno. Chapter 8, Section 72–801; Colorado Rev.Stats. Chapter 102, Section 102–1–1; Georgia Code Anno., Title 84, Section 1101; Nevada Rev.Stats., Title 54, Section 636.010.

Interestingly, after the Supreme Courts of Arkansas and Georgia had held that un-

der their then statutes highly similar to our present statutes, that optometry was not a learned profession, the legislatures of those two states amended their optometry statutes to specifically declare that optometry was a learned profession. The courts gave accord to this declared legislative policy, the Arkansas court stating that though the legislative policy might be questioned, it was the constitutional right of the legislature to declare optometry to be a learned profession. Melton v. Carter, 204 Ark. 595, 164 S.W.2d 453. See also Lee Optical of Georgia v. Georgia State Board, etc., 220 Ga. 204, 138 S.E.2d 165.

We hold that in light of our statutory provisions and the policy to be deduced therefrom that the practice of optometry is not to be considered as the practice of a learned profession. Our statutes on optometry merely regulate the practice of optometry. Under these conditions, and in the absence of special statutory provisions necessitating a different conclusion, the courts have refused to construe such statutes as prohibiting the employment of persons licensed to practice optometry. Mack v. Saars, supra, and cases cited therein.

In McCrory v. Wood, 277 Ala. 426, 171 So.2d 241, this court upheld the constitutionality of Section 206 which provides among other things that the license of an optometrist may be revoked for "the doing or performing of any acts in his profession declared by the Alabama Optometric Association to be unethical or contrary to good practice."

The court took pains, however, to make clear that the State Board of Optometry may not enforce any rule or regulation of the Alabama Optometric Association which is inconsistent with the express provisions of our optometric statutes, stating, "We will not allow anyone to be penalized for acts expressly permitted by statute," and that administrative action cannot subvert or enlarge upon expressed statutory policy, nor deviate from such policy. We must therefore look to the legislative policy to be found in our statutes regulating optometry.

We also wish to note that this proceeding does not involve any misconduct by a duly licensed optometrist. It is solely against Lee which does not, and indeed could not, obtain a license to practice optometry. The only point involved in this proceeding is whether it is unlawful for Lee to employ a licensed optometrist, or to permit one to practice on its premises.

It is our conclusion therefore that the decree here appealed from is erroneous, and must be reversed.

Reversed and rendered.

HEFLIN, C. J., and LAWSON, MERRILL and MADDOX, JJ., concur.