BRYAN, Judge.
 

 Joe Zegarelli appeals from a judgment granting the summary-judgment motion of the Montevallo Planning and Zoning Commission (“the Commission”) and denying Zegarelli’s summary-judgment motion. We affirm.
 

 The trial court’s judgment recites the factual background pertinent to this appeal:
 

 “At [its October 18, 2007, public] meeting the Commission considered proposals for the development of townhomes on two parcels of property located within close proximity to each other. The first proposal considered by the Commission was the Montevallo Square project submitted by Mr. Joe Zegarelli.... The second proposal considered by the Commission was for the development of the Shoal Creek Cove project submitted by Mr. Mickey Hardy....
 

 “Mr. Zegarelli’s Montevallo Square development consisted of a 9.68 acre tract of land proposed for 90 townhomes to be developed in phases. Phase One consisted of 49 townhomes on 5.3 acres. The other 41 townhomes were to be developed on the remaining acreage dur-
 
 *825
 
 mg Phase Two. Mr. Zegarelli purchased the property for the purpose of developing it in accordance with information he had obtained from the city planner and engineer, both of whom ultimately recommended the project to the Commission.
 

 “When the project came before the Commission for vote at its October 18, 2007, meeting, Mayor Anderson abstained from voting on the Montevallo Square project, citing a potential conflict of interest. The result was that four commission members voted in favor of the project, and four voted against. Absent the mayor’s vote, the project failed to obtain approval. Immediately thereafter the Shoal Creek Cove proposal was brought before the Commission.
 

 “The Shoal Creek Cove development consisted of 66 townhomes and 40 apartments to be combined with 26 existing apartments for a total of 182 units to be situated on 15.88 acres of land. Just as they had done with the Montevallo Square project, the city engineer and the city planner recommended that the Commission approve the site plan proposed for the Shoal Creek Cove project. The vote on the motion to approve the Shoal Creek Cove project was divided between the commission members, four in favor and four against, exactly as the Montevallo Square vote. In this instance, however, the mayor cast the deciding vote in favor of approval.
 

 “The result of the October 18, 2007, planning commission meeting was that of the two townhome projects proposed under the D-2 Development District designation of the Montevallo Zoning Ordinance, both of which were recommended for approval by city officials who had determined that the proposals complied with the D-2 Development District requirements; one project was approved, and the other was not. The minutes of the meeting reflect the commissioners’ concern over this apparent ‘inconsistency’ caused by the commissioners’ conflicting interpretation and application of the zoning ordinance which governs the D-2 Development District. The inevitable result is that Mr. Zegarelli has filed suit in the nature of a Writ of Mandamus, requesting that the court order the Montevallo Planning and Zoning Commission to approve his application for the Montevallo Square subdivision. Mr. [Roderick] MacPher-son[, a citizen of Montevallo,] has filed suit seeking a Declaratory Judgment that the Montevallo Planning and Zoning Commission was without authority to approve Mr. Hardy’s proposed Shoal Creek Cove subdivision plan. MacPher-son alleges that the plan did not comply with the D-2 Development District density requirements as mandated by the Montevallo Zoning Ordinance.”
 

 In Zegarelli’s action, the Commission moved the trial court for a summary judgment. The Commission asserted that it was entitled to a summary judgment because, it said, the four members of the Commission who had voted against the motion to approve Zegarelli’s site plan had done so because they interpreted the Mon-tevallo Zoning Ordinance (“the zoning ordinance”) to provide that Zegarelli could not build more than five townhouses per acre on his land, which was a reasonable interpretation of the zoning ordinance, and, therefore, the Commission’s failure to approve Zegarelli’s site plan was not arbitrary and capricious.
 

 Zegarelli filed a cross-motion for a summary judgment. He asserted that he was entitled to a summary judgment because, he said, his site plan complied with the zoning ordinance and the Montevallo Subdivision Regulations (“the subdivision reg
 
 *826
 
 ulations”) and the Commission did not have the authority to withhold its approval of a site plan that complied with the zoning ordinance and the subdivision regulations.
 

 The trial court
 
 sua sponte
 
 consolidated Zegarelli’s action against the Commission with MacPherson’s action against the Commission and Hardy for purposes of hearing and ruling on the cross-motions for a summary judgment that had been filed in both cases. Following a hearing, the trial court entered a single consolidated judgment in both Zegarelli’s action and MacPherson’s action. With respect to Ze-garelli’s action, the judgment granted the Commission’s summary-judgment motion and denied Zegarelli’s summary-judgment motion. Explaining its rationale, the trial court stated:
 

 “The pertinent portions of the applicable Montevallo Zoning Ordinance are as follows:
 

 “ ‘ARTICLE III. Definitions
 

 “
 
 ‘Density Factor.
 
 An intensity measure expressed as the number of units per net buildable site area. It is the density on the buildable portion of the site....
 

 “
 
 ‘Gross Density.
 
 The quotient of the total number of dwelling units divided by the total area of a site used for residential purposes....
 

 “
 
 ‘Impervious Surface Ratio. A
 
 measure of the intensity of land use which is determined by dividing the total area of all impervious surfaces on a site by, in the case of residential uses the area used to determine the required open space or in the case of nonresidential uses, the buildable site area....
 

 “‘ARTICLE VIII. Development Districts
 

 “ ‘Section 3. D-2 Development District.
 

 “ ‘B.
 
 Performance
 
 Subdivisions— The primary purpose of this district is to accommodate residential development without impacting on sensitive lands. The following uses are permitted:
 

 “ ‘(1) Single family attached and detached dwellings.
 

 “ ‘(2) Two-family dwellings.
 

 “‘(3) Multiple family dwelling including condominiums, town houses and apartments....
 

 “ ‘C. The following performance regulations apply to residential uses in performance subdivisions:
 

 “ ‘(1) Maximum gross density of five dwelling units per acre.
 

 “‘(2) Minimum open space ratio of 0.30.
 

 “ ‘(3) Maximum density factor of 10 residential units per acre.
 

 “ ‘(4) Maximum impervious surface ratio of 0.38.’
 

 “Zoning Ordinance, City of Montevallo, Alabama, adopted by Montevallo City Council May 10,1999, amended April 14, 2003.
 

 “It is undisputed that the above stated portions of the Montevallo Zoning Ordinance are those governing the Monteval-lo Square and Shoal Creek Cove proposals. Both proposals were presented to the Commission with the approval and recommendation of city officials, including the city planner and the city engineer; and both proposals contained less than ten residential units per acre. The city officials, the mayor, and at least four members of the Commission have determined that the maximum number of available units in a D-2 Development District Performance Subdivision is calculated by multiplying the total site acreage times ten. The result of this calculation is used as the maximum
 
 *827
 
 number of units to be constructed on any given site. By this method the Montevallo Square project proposed 49 townhomes on 5.3 acres of land which has a 53 unit cap. The Shoal Creek Cove project proposed 132 total units on 15.88 acres of land which would have accommodated up to 158 units.
 

 “The density calculations were made pursuant to Section 3.C.(3) of the Zoning Ordinance which states that the D-2 Development District Performance Subdivision is limited to a ‘[m]aximum density factor of 10 residential units per acre.’ Both developers contended that their project met this zoning requirement, and was, therefore, due to be approved by the Commission. Nevertheless, Mr. Zegarelli’s Montevallo Square development failed to obtain approval as a result of the four-four tie vote. Mr. Hardy’s Shoal Creek Cove proposal was approved by a five to four vote because of the mayor’s tiebreaker.
 

 “Mr. Zegarelli contends that because his proposal conformed to all of the D-2 requirements, the Commission was without authority to prevent the development of this project. Mr. Zegarelli [elites a plethora of cases to the effect that a planning commission has no discretion or choice but to approve a subdivision which conforms to the regulations, and that mandamus is appropriate when the developer has complied with all applicable ordinances. See, e.g.,
 
 Smith v. City of Mobile,
 
 374 So.2d 305, 307-08 (Ala.1979). The court finds Mr. Zegar-elli’s argument compelling. If his proposed development complied with the Montevallo Zoning Ordinance, the Commission had no authority to deny the development.
 

 “In support of his argument Mr. Ze-garelli notes with incredulity that moments after his development was rejected, the Shoal Creek Cove development was approved. This fact was not lost on the commissioners, as the minutes of the meeting reflect the concern ‘that there is inconsistency in denying Montevallo Square and approving the Hardy property.’ In defending these two actions, i.e., the denial of Mr. Zegarelli’s development and the approval of Mr. Hardy’s, the city invokes vague notions of broad authority, wide ranging discretion, and other factors pertaining to the individual development. The reason for the awkward position in which the city finds itself is brought to light by Mr. Mac-Pherson in his complaint for declaratory judgment, and laid bare in the planning commission meeting minutes. Those minutes reflect that one commissioner wished ‘to discuss with the developer about decreasing the development’s density.’ Another ‘objects to the density and does not see ambiguity in the ordinance.’ One of the ‘nay' votes was cast for denial ‘due to gross density.’ This commissioner reiterated the reason for his ‘nay’ vote on the Shoal Creek Cove development, stating ‘that it exceeds five units per acre.’ Had it not been for the mayor’s ‘aye’ vote on the Shoal Creek Cove proposal, neither project would have been approved because of the Commission’s stalemate over the zoning ordinance's] density requirements for a D-2 Development District Performance Subdivision.
 

 “The mayor, other city officials, and four commissioners deem the maximum density factor for Performance Subdivisions to be TO residential units per acre,’ pursuant to zoning ordinance Article VIII, Section 3.C.(3). Four commissioners believe the statutory language allows the maximum density to be half that, or a ‘[m]aximum gross density of five dwelling units per acre,’ pursuant to Section 3.C.(1). In support of the
 
 *828
 
 lat[t]er interpretation, the meeting minutes reflect one of the commissioner’s statement that he ‘does not see ambiguity in the ordinance.’ From this the court infers that the four proponents of the first interpretation, along with the mayor and other city officials, find some ambiguity in the ordinance which permits them to rely solely on paragraph C.(3), ‘maximum density factor of 10 residential units per acre,’ and to completely ignore paragraph C.(l), ‘maximum gross density of five dwelling units per acre.’ Both Mr. Zegarelli and Mr. Mac-Pherson have placed this issue squarely before the court.
 

 “It is a long standing principle of statutory construction that courts are to construe statutes (in this the case the Montevallo Zoning Ordinance)
 

 “ ‘as a whole, so as to harmonize their parts if possible.
 
 McRae v. Security Pacific Housing Services, Inc.,
 
 628 So.2d 429 (Ala.1993);
 
 Lee Optical Co. of Alabama v. State Bd. of Optometry,
 
 288 Ala. 338, 261 So.2d 17 (1972).
 

 ““‘A statute [ordinance] is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole.”
 

 “ ‘2A Singer,
 
 Statutes and Statutory Construction,
 
 § 46.05 (1992).’
 

 “Karrh v. Board of Control of the Employees’ Retirement System of Alabama,
 
 679 So.2d 669, 672 (Ala.1996).
 

 “ ‘ “The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute.”
 
 IMED Corp. v. Systems Eng’g Assocs. Corp.,
 
 602 So.2d 344, 346 (Ala.1992). “‘However, when possible, the intent of the legislature should be gathered from the language of the statute itself.’”
 
 Perry v. City of Birmingham,
 
 906 So.2d 174, 176 (Ala.2005) (quoting
 
 Beavers v. Walker County,
 
 645 So.2d 1365, 1376 (Ala.1994));
 
 Ex parte Lamar Advertising Co.,
 
 849 So.2d 928, 930 (Ala.2002). Therefore, in “determining the meaning of a statute, we must begin by analyzing the language of the statute.”
 
 Holcomb v. Carraway,
 
 945 So.2d 1009, 1018 (Ala.2006).
 

 “ ‘ “Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.”
 

 “
 
 ‘IMED Corp.,
 
 602 So.2d at 346;
 
 see also Wynn v. Kovar,
 
 963 So.2d 84 (Ala.Civ.App.2007). Stated differently, when “the language of a statute is plain and unambiguous, ... courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning — they must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the Legislature.”
 
 Ex parte T.B.,
 
 698 So.2d 127, 130 (Ala.1997);
 
 see also Perry,
 
 906 So.2d at 176;
 
 Ex parte Lamar Advertising Co.,
 
 849 So.2d at 930;
 
 Beavers,
 
 645 So.2d at 1376-77;
 
 Ex parte United Serv. Stations, Inc.,
 
 628 So.2d 501 (Ala.1993); and
 
 IMED Corp.,
 
 602 So.2d at 344.
 

 “ ‘... “When determining legislative intent from the language used in a statute, a court may explain the language but it may not detract from
 
 *829
 
 or add to the statute.... Courts may not improve a statute, but may only expound it.”
 
 Siegelman [v. Chase Manhattan Bank (USA), Nat’l Ass’n],
 
 575 So.2d [1041] at 1045 [(Ala.1991)].
 

 “ ‘These rules of statutory construction and their corresponding limits on this court’s authority are founded in the separation-of-powers requirement of Art. Ill, § 43, Ala. Const.1901 (offrecomp.) As our supreme court has discussed:
 

 “ ‘ “It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. See
 
 Ex parte T.B.,
 
 698 So.2d 127, 130 (Ala.1997).”
 

 “
 
 ‘De[K]alb County LP Gas Co. v. Suburban Gas, Inc.,
 
 729 So.2d 270, 276 (Ala.1998).’
 

 “Alabama Department of Environmental Management v. Legal Environmental Assistance Foundation, Inc.,
 
 973 So.2d 369, 376-77 (Ala.Civ.App.2007).
 

 “Applying the principles of statutory construction and plain language to the portions of the Montevallo Zoning Ordinance at issue, the court finds no ambiguity. While the court may not have utilized the ordinances’ organization, syntax or phraseology, when read in its entirety there can be only one reasonable interpretation or conclusion: The maximum number of units permitted by the Montevallo Zoning Ordinance in a D-2 Development District for Performance Subdivisions is determined by deducting from the total available acreage 30 percent of that acreage to be utilized for open space (‘Minimum open space ratio of 0.30.’). Up to 38 percent of the open space area may be utilized for all impervious surfaces (‘Maximum impervious surface ratio of 0.38’). Regardless of the impervious surface ratio, no more than 70 percent of the total area of the site may be considered as the buildable portion of that site. On that ‘net builda-ble site area’ up to 10 residential (dwelling) units may occupy a single acre of land (‘Maximum density factor of 10 residential units per acre.’).
 

 “While each of the foregoing percentages and ratios may vary from project to project, the foundational density requirement that can not be exceeded under any circumstance is delineated in the first sentence of paragraph C, which states that in Performance Subdivisions there is a ‘[m]aximum gross density of five dwelling units per acre.’ Gross density is defined as the total number of residential or dwelling units divided by the total site acreage. For Performance Subdivisions the gross density is unequivocally limited to five units per acre. This calculation is straight forward and determines the maximum number of residential units available for any given site. It is by definition a ‘gross’ number of units that can readily be determined, irrespective of the specific site constraints or building conditions which must be considered when developing the overall site plan to conform with the other zoning requirements.
 

 “Contrary to Mr. Hardy’s position, the specified density requirements are not mutually exclusive. The ordinance contains no ‘either, or’ language, and both
 
 *830
 
 density requirements must be satisfied. The plain language of the zoning ordinance simply provides no exception to the maximum gross density requirement for a Performance Subdivision in a D-2 Development District. When this requirement is applied to Mr. Zegarelli’s proposal for Phase One of the Monteval-lo Square project which would occupy 5.3 acres, a maximum of 26 units could be constructed on the site (five units per acre x 5.3 acres = 26.5 units). The Montevallo Square proposal included 49 townhomes to be built on this portion of the site. Phase Two provided for 41 units to be built on the remaining 4.38 acres, while the maximum gross density requirement allows only 21 units (five units per acre x 4.38 acres = 21.9 units).
 

 “The Shoal Creek Cove project consisted of 15.88 acres. Pursuant to the ordinance, the maximum number of units that may occupy this site is 79 (15.88 acres x 5 units per acre = 79.4 units). Mr. Hardy’s Shoal Creek Cove project comprised a total of 132 units which included 26 existing apartments. The maximum gross density requirement limits additional development on this site to 53 units, rather than the 106 unit increase approved by the Commission.
 

 [[Image here]]
 

 “The court finds that in each of the [consolidated actions] there is no genuine issue of material fact, and that judgment as a matter of law is due to be entered. As neither Mr. Zegarelli’s Montevallo Square project nor Mr. Hardy’s Shoal Creek Cove project comply with the maximum gross density requirement as mandated by the City of Montevallo Zoning Ordinance, the Mon-tevallo Planning and Zoning Commission had no authority to approve either project. Accordingly, Mr. Zegarelli’s Motion for Summary Judgment is DENIED, and the Motion for Summary Judgment filed by the City of Monteval-lo is GRANTED. Summary judgment is hereby entered in favor of the City of Montevallo and against Mr. Zegarelli. Consistent therewith, the Motion for Summary Judgment filed by Mr. Hardy and the City of Montevallo defendants is DENIED, and the Motion for Summary Judgment filed by Mr. MacPherson is GRANTED. Summary judgment is hereby entered in favor of Mr. Mac-Pherson and against Mr. Hardy and the city defendants. All other relief requested by the parties is DENIED or otherwise rendered Moot by this Order.”
 

 (Capitalization in original.)
 

 Zegarelli filed a postjudgment motion, which was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P.
 
 [1]
 
 Zegar-elli then timely appealed to this court.
 

 “We review a summary judgment de novo.
 
 American Liberty Ins. Co. v. AmSouth Bank,
 
 825 So.2d 786 (Ala.2002).
 

 “ ‘We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the non-movant to present substantial evidence creating a genuine issue of material fact. “Substantial evidence” is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reason
 
 *831
 
 ably infer the existence of the fact sought to be proved.” In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw.’
 

 “Nationwide Prop. & Cas. Ins. Co. [v. DPF Architects, P.C.],
 
 792 So.2d [369] at 372 [(Ala.2001)] (citations omitted), quoted in
 
 American Liberty Ins. Co.,
 
 825 So.2d at 790.”
 

 Potter v. First Real Estate Co.,
 
 844 So.2d 540, 545 (Ala.2002).
 

 Zegarelli argues that the trial court erred in concluding that the zoning ordinance is unambiguous with respect to the maximum density of dwelling units that can be built in a Performance Subdivision in a D-2 Development District. Further, Zegarelli says, because the zoning ordinance is ambiguous in that regard, it should be construed to allow 10 townhouses per acre of the total site area despite the language in the zoning ordinance imposing a maximum-gross-density restriction of 5 dwelling units per acre. Zegarelli further argues that, under the construction of the zoning ordinance he advocates, his site plan complied with the zoning ordinance and that, therefore, the Commission had no authority to withhold its approval.
 

 We disagree with Zegarelli’s argument that the trial court erred in concluding that the zoning ordinance is unambiguous regarding the maximum density of dwelling units that can be built in a D-2 Development District Performance Subdivision. As the trial court correctly pointed out, the zoning ordinance contains both a density-factor limit and a gross-density limit, and both of those limits must be complied with. Article III of the zoning ordinance defines the density factor as “the number of units per net buildable site area,” and it defines gross density as “[t]he quotient of the total number of dwelling units divided by the total area of a site.” Article VIII of the zoning ordinance provides that the maximum density factor for a Performance Subdivision in a D-2 Development District is 10 dwelling units per acre and that the maximum gross density in such a subdivision is 5 dwelling units per acre. Because the density factor is the number of dwelling units
 
 per net buildable acre
 
 of the site while gross density is the number of dwelling units
 
 per acre of the total site area,
 
 the maximum-gross-density limit of 5 dwelling units per acre does not conflict with the maximum-density-factor limit of 10 dwelling units per acre. A proposal to build 49 townhouses would not comply with both those limits unless the site had at least 4.9 acres of net buildable area (49 townhouses divided by 4.9 net buildable acres equals 10 townhouses per net buildable acre) and a total area of at least 9.8 acres (49 townhouses divided by 9.8 total acres equals 5 townhouses per acre of the total site area).
 
 [2]
 
 The site where Zegarelli proposed to build 49 townhouses had a total area of only 5.3 acres. Therefore, it did not comply with the maximum-gross-density limit of the zoning ordinance.
 

 Accordingly, the trial court did not err in concluding that the zoning ordinance
 
 *832
 
 was unambiguous, that Zegarelli’s site plan did not comply with the zoning ordinance, that the Commission was entitled to a summary judgment, and that Zegarelli was not entitled to a summary judgment. Therefore, we affirm the trial court’s judgment.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.
 

 [1]
 

 . The trial court purported to enter an order denying Zegarelli's postjudgment motion after it had already been denied by operation of law pursuant to Rule 59.1.
 

 [2]
 

 . Likewise, a proposal to build 41 townhouses would require a site with a net buildable area of at least 4.1 acres (41 townhouses divided by 4.1 net buildable acres equals 10 townhouses per net buildable acre) and a total area of at least 8.2 acres (41 townhouses divided by 8.2 total acres equals 5 townhouses per acre). Thus, a proposal to build 90 townhouses would require a site with a net builda-ble area of at least 9 acres (90 townhouses divided by 9 net buildable acres equals 10 townhouses per net buildable acre) and a total area of at least 18 acres (90 townhouses divided by 18 total acres equals 5 townhouses per acre of the total site area).